(No. 66170.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ROBERT GALVIN, Appellee.

*Opinion filed February 22, 1989.*

STAMOS and CALVO, JJ., took no part.

Neil F. Hartigan, Attorney General, of Springfield, and Edward F. Masters, State's Attorney, of Joliet (Shawn W. Denney, Solicitor General, Terence M. Madsen and Gary H. Schwartz, Assistant Attorneys General, of Chicago, and Kenneth R. Boyle, John X. Breslin and Gerald P. Ursini, of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Matthew A. Maloney, Public Defender, of Pierson, Maloney & Rayfield, of Princeton, for appellee.

JUSTICE CUNNINGHAM delivered the opinion of the court:

This appeal concerns the admissibility of evidence obtained during a police "stop and frisk." Defendant, Robert Galvin, was charged with theft and possession of burglary tools. (Ill. Rev. Stat. 1985, ch. 38, pars. 16—1(d)(1), 19—2(a).) Prior to trial, defendant filed a motion to suppress evidence seized pursuant to the search, which was allowed by the circuit court of Will County. The appellate court affirmed, with one justice dissenting. (161 Ill. App. 3d 190.) We granted the People's petition for leave to appeal under our Rule 315 (107 Ill. 2d R. 315). We affirm.

## FACTS

At the hearing on the motion to suppress, Crest Hill police officer Simenson and defendant testified. According to Officer Simenson, there had been multiple burglaries in the Chaney area, a predominantly white residential area of Crest Hill. The burglaries had taken place from September 9, 1986, to September 14, 1986, and

had occurred between 7 and 10 p.m. Because of this, there was a police surveillance being conducted in the Chaney area on September 14. Officer Simenson and Officer Pesavento, both in plain clothes and in an unmarked squad car, and another undercover officer in an unmarked squad car, were participating in the surveillance.

A resident of the Chaney area, known in the record as Mrs. Cerven, had talked to Officer Simenson on the telephone on September 14, 1986, sometime before Officer Simenson went to participate in the surveillance that evening. Mrs. Cerven's home had been burglarized sometime between September 9 and September 14. She had told an anonymous woman this, and the anonymous woman told Mrs. Cerven information which Mrs. Cerven thereafter passed on to Officer Simenson.

Officer Simenson testified that the anonymous woman told Mrs. Cerven that in the early evening hours of September 9, the anonymous woman was sitting in her car near an alley on Center Street, in the Chaney neighborhood, waiting for her husband. A brown Oldsmobile four-door, perhaps a 1974 model, was parked somewhat near her vehicle. It appeared as though no one was inside the Oldsmobile. The anonymous woman saw a black male come into her view from the alley, heading toward the Oldsmobile. According to Officer Simenson, the anonymous woman told Mrs. Cerven that the black male was "apparently hiding something under his coat." Officer Simenson did not remember if the anonymous woman had provided a description of this man to Mrs. Cerven; if there had been a description, it was vague.

This man got into the driver's side of the Oldsmobile, and the anonymous woman then said she saw a black man sit up who had apparently been hiding in the passenger side of the Oldsmobile. The woman found this to

be suspicious and wrote down the license plate number and description of the car. There had been a burglary in this area between 7 and 10 p.m. on September 9. Officer Simenson did not know whether the anonymous woman who told Mrs. Cerven of the suspicious car knew of any burglary at the time she observed the suspicious car.

Once Mrs. Cerven told this anonymous woman that Mrs. Cerven's home had been burglarized, the woman told Mrs. Cerven about the suspicious car. Mrs. Cerven then told Officer Simenson over the phone what this woman had told her. Officer Simenson did not know where Mrs. Cerven lived or when her home had been burglarized. Officer Simenson's testimony is the only evidence which appears in the record to indicate that any burglary or burglaries had taken place in the Chaney area.

At approximately 9 p.m. on September 14, 1986, Officer Simenson first saw defendant slowly driving a brown Oldsmobile south on Hickory Street in the Chaney area. When the car reached Stern Street, it began to make what appeared to be a right turn, but then turned left, heading east toward Broadway (Route 53), and parked shortly after this turn on Stern Street. Officer Simenson observed two black males get out of the car, and walk westward on Stern Street to the corner of Stern and Cora, where there was some type of construction work. The two men walked into the backyard of a house which had no lights on. The two men were not seen again until 40 minutes later, when they came out of the backyard and walked eastward back to where the car was parked. The license plate number of this car was the same one which Mrs. Cerven had told Officer Simenson about previously. Officer Simenson had run a license plate search, and had found that the car belonged to Robert Galvin. Officer Simenson knew that defendant had previously been arrested for burglary and theft.

Officer Pesavento told Officer Simenson that during the walk back from Cora Street to where the car was parked on Stern Street, the two men had looked in all directions and had appeared nervous. Officer Pesavento also said that he had seen one of the two men put an "unknown object" into a pocket. It is unclear whether this "unknown object" was placed in a jacket pocket or pants pocket.

Defendant and Percy Unger walked past where the car was parked and went to Transmission Works, a business located on Broadway. Transmission Works was closed. Officer Simenson said the men looked inside several cars. Defendant and Unger then went back to the car and exchanged a "high-five."

Defendant and Unger drove east to Broadway, made a left turn and went north up Broadway one block, then made a left turn, heading west on Ludwig Street. They continued west on Ludwig Street until making a left turn onto Cora Street, heading south. Officer Simenson said the car pulled into the driveway of the same house where defendant and Unger had been previously, located on the corner of Cora and Stern. After idling for several moments, the car backed up and headed north on Cora Street. The car stopped one block north on Cora Street from where they had been in the driveway. Defendant and Unger got out of the car, and Officer Simenson saw the trunk open.

Defendant and Unger were heading into the yard of a house to the east of where they were parked when a marked Crest Hill police squad car pulled up near defendant's car. The driver of the squad car, Sergeant Gudac, had been monitoring the surveillance radio traffic and had mistakenly thought an arrest was about to take place. Sergeant Gudac left the area after Officer Simenson told him to.

Defendant and Unger then got back into their car. They had been out of the car for about two minutes. Defendant drove north on Cora Street, headed east to Broadway Street (Route 53), and then went south on Broadway out of Crest Hill.

One marked Crest Hill squad car, one unmarked squad car with red lights, and Officer Simenson's unmarked squad car with red lights flashing and siren sounding effectuated a stop of defendant and Unger approximately two to three miles south of the Chaney area on Broadway at Marble in Joliet. At the time this stop was made, there had been no statutory violations observed by any officer, nor were there any warrants for arrest or search.

Officer Simenson had his gun drawn when he ordered the driver, defendant, to get out of the car. Defendant immediately complied with the request, offered no resistance, and put his hands on the roof of his car following Officer Simenson's instructions. Officer Simenson testified that when he first approached defendant, defendant had a pair of gloves on his lap. According to the record, this is the first time any gloves were seen by any officer in the possession of either defendant or Unger.

Officer Simenson then patted-down defendant. He testified that he felt something in defendant's right front pants pocket and wanted to investigate further. Officer Simenson did not remember what he thought it was, other than he remembered thinking that it could have been a weapon. Officer Simenson testified that he retrieved a padlock and a rifle ammunition magazine with live ammunition in it. He could not remember which of these items he pulled out of defendant's right front pants pocket first, or if he pulled both objects out at once. At that point, defendant was "technically under arrest" for possession of ammunition.

During this time the other passenger, Percy Unger, had exited the car and was searched by Officer Pesavento. The result of that pat-down search was a pair of gloves removed from Unger's pockets. Officer Simenson was not sure if the gloves were removed from Unger's pants pocket or jacket pocket. No contraband or weapons were found on Unger. Officer Simenson then searched the car for anything that could have had to do with the ammunition that defendant had had on his person. He testified that he found a flat-head screwdriver and a flashlight next to each other on the floorboard nearly under the seat on the driver's side.

When Officer Simenson began the search of the car, defendant was under arrest for possession of ammunition; Unger was not under arrest. After Officer Simenson concluded his search of defendant's car, he placed handcuffs on defendant. It was at this time that defendant was told he was under arrest for possession of ammunition. Officer Simenson placed Unger under arrest for possession of burglary tools, specifically, possession of the screwdriver.

Officer Simenson testified that the offense report made out by him should have stated that defendant was placed under arrest for possession of ammunition, but did not. The offense report charged defendant with theft over $300 and possession of burglary tools. Officer Simenson testified that he did not feel that the gloves or flashlight were burglary tools; only the screwdriver was a burglary tool. The offense report stated the location of the offense of possession of burglary tools was Broadway and Stern Streets in Crest Hill.

Defendant also testified at the hearing on the motion to suppress. Defendant testified that he was only in the Chaney area for 10 minutes or so. He said that he was heading south on Broadway toward Transmission Works, and turned west on the street before the business

(Ludwig Street). Defendant then made a left turn at the first street heading south (Hickory) and it was at the corner of Hickory and Stern that he turned left on Stern after almost turning right. Defendant said there was no certain reason for this.

Defendant parked his car on Stern Street, close to Broadway (Route 53), so he could check the operating hours of Transmission Works. Defendant said that the Transmission Works' lot was filled with cars, so he had driven through the Chaney area to be able to park on the left hand side of the building by a tavern; that way he could just go out and get on Broadway when he was through at Transmission Works. While at this closed business, defendant said he looked at a car, but denied looking into any windows.

Defendant denied going into any backyards. He denied that the trunk of his car was open at any point. Defendant testified that when he was stopped by the police, five officers jumped out of their cars, and three officers had their guns pointed at him. He got out of his car with his hands in the air. Defendant also said that Officer Simenson found the ammunition clip in his left front pocket, but that the screwdriver, flashlight and padlock were all found in the glove compartment, not on the floorboard.

Defendant said that although he was told by Officer Simenson that he could be placed under arrest for possession of ammunition, he was not; he was placed under arrest for possession of burglary tools.

## STANDARD OF REVIEW

This is an appeal by the People from an allowance of defendant's motion to suppress. This court has made clear that a trial court's determination on a motion to suppress will not be overturned unless it is manifestly erroneous. (*People v. Winters* (1983), 97 Ill. 2d 151, 158;

*People v. Holloway* (1981), 86 Ill. 2d 78, 91; *People v. Williams* (1974), 57 Ill. 2d 239, 246, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506.) At a hearing on a motion to suppress, it is the function of the circuit court to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence. *People v. Akis* (1976), 63 Ill. 2d 296, 298.

## ANALYSIS

Both the circuit court and the appellate court found the stop of defendant to be valid under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, and section 107—14 of the Code of Criminal Procedure of 1963, which provides:

"§107—14. Temporary Questioning without Arrest. A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." Ill. Rev. Stat. 1985, ch. 38, par. 107—14.

In *Terry v. Ohio*, the Supreme Court said:

"[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.)

Under *Terry*, the question whether a stop is valid is a distinct and separate inquiry from whether a frisk is valid. We look first to the question of the stop.

## THE STOP

The People assert that the propriety of the initial stop is not in dispute. Defendant, however, urges this court to find that the initial stop of defendant was invalid.

The circuit court noted the discrepancy in the testimony between Officer Simenson and defendant regarding defendant's actions in driving around the Chaney area and where the screwdriver was found. The circuit court specifically resolved these discrepancies in favor of Officer Simenson, having found defendant's testimony on these matters to be strained and unbelievable.

After thoroughly reviewing the facts, the circuit court specifically found that at the time the stop was made, the Crest Hill police officers had sufficient articulable facts which justified the initiation of a temporary stop for investigatory purposes. The appellate court found "that Officer Simenson reasonably suspected that the defendant's unusual conduct could be indicative of past or prospective criminal activity. Consequently, Simenson appropriately detained the defendant for temporary questioning." 161 Ill. App. 3d at 192.

In so finding, the appellate court determined that the holding of the circuit court was not against the manifest weight of the evidence. (*People v. Winters* (1983), 97 Ill. 2d 151, 158.) We have made a thorough review of the record in this case, and agree that the *Terry* stop was proper.

## THE FRISK

Both the circuit court and the majority of the appellate court found the frisk of defendant to be invalid under *Terry* and section 108—1.01 of the Code of Criminal Procedure of 1963, which provides:

"§108—1.01. Search During Temporary Questioning. When a peace officer has stopped a person for temporary questioning pursuant to Section 107—14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons. If the officer discovers a weapon, he may take it until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person so questioned." (Ill. Rev. Stat. 1985, ch. 38, par. 108—1.01.)

The dissent found the frisk to be valid.

The People argue that both the circuit court and the appellate court made legal errors in reaching the determination that defendant's motion to suppress should be allowed.

In addition, the People argue that *People v. McGowan* (1977), 69 Ill. 2d 73, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624, requires a reversal of the courts below. We shall address each argument in turn.

The People argue that the circuit court incorrectly considered the fact that not one of the five officers involved in the stop asked any investigatory questions before the initial frisk. While it is true that a police officer is not always required to ask questions before frisking a suspect legitimately stopped pursuant to *Terry v. Ohio*, it is also true that the right to frisk does not automatically follow the right to stop. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.

Officer Simenson testified that he wanted to stop defendant to ask him questions regarding his activities on that night, September 14, and on the night his car was reported to have been seen in the Chaney area on

September 9. The circuit court had found that "the officers did not comply with the statutory and case law provisions relating to a *Terry* stop, and that they conducted their pat-down search for weapons prior to the time they conducted any investigatory or temporary questioning." However, the circuit court also said:

"Officer Simenson, in this case, specifically testified that he at no time thought the defendants were armed, had weapons, or that he was in danger ***. These defendants were neither armed robbery or murder suspects. They were burglary suspects with absolutely no indication of any tendency or history of violence or reason to believe that they were armed or had access to any type of weapons that would harm the officers."

We conclude from our reading of the record that the circuit court allowed the motion to suppress based not on an incorrect legal conclusion that police officers must always question suspects before a frisk but on a factual determination that a reasonably prudent person in the circumstances confronted by the five officers would not have been warranted in the belief that his or her safety or that of others was in danger.

The People also argue that the appellate court wrongly applied a subjective standard to the question whether there existed circumstances which would justify a frisk. The majority did say that "since the officer in the instant case believed that he was not in any danger, the pat search which he conducted was in violation of the *** law." (161 Ill. App. 3d at 193.) The dissent pointed to this language when he concluded that an erroneous legal standard was applied by the majority to the question of the validity of the search.

The People and the dissent both agree that the language in *Terry v. Ohio* is clear that an objective standard must be used when deciding the validity of a frisk

after a valid investigatory stop. As was explained by the Supreme Court:

> "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard \*\*\*." (392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.)

We agree with the People and the dissent, and with the Supreme Court, that the appropriate test must be an objective one. *People v. Lee* (1971), 48 Ill. 2d 272, 276.

If the test were otherwise, one of two unfavorable results would certainly occur. In the first instance, an officer who subjectively feels no fear in a situation where a reasonably prudent person in the same circumstances would fear for his or her own safety would never be justified in conducting a pat-down search of a suspect temporarily stopped pursuant to a valid *Terry* stop. Secondly, if a police officer may always search any suspect validly stopped pursuant to *Terry v. Ohio* by invoking a subjective fear which will not be measured against any standard of objective reasonableness based on the totality of the circumstances known to the officer at the time of the search, then the officer would effectively be able to insulate his or her actions from the constitutional safeguards guaranteed to individuals under the fourth and fourteenth amendments. Neither of these results would help in the delicate balance of competing interests involved in questions concerning the reasonableness of State action when measured against the fourth amendment: the "interest of the public in the suppression of crime on the one hand, and on the other the constitutionally guaranteed security of the individual against un-

reasonable searches and seizures." *People v. Parren* (1962), 24 Ill. 2d 572, 575.

We do not agree, however, that the majority relied on a subjective standard in concluding that the circuit court was not manifestly erroneous in allowing defendant's motion to suppress. Although, for reasons given above, an officer's subjective feelings may not dictate whether a frisk is valid, the testimony of an officer as to his subjective feelings is one of the factors which may be considered in the totality of the circumstances known to the officer at the time of the frisk. In addition to the sentence relied on by the People and the dissent to support the argument that the majority applied an erroneously subjective test to the question of the frisk, the majority also stated:

> "In the instant case the defendant immediately stopped and exited his vehicle as requested by three police officers with drawn guns. Instead of being interrogated, the defendant was ordered to stand against his vehicle for a pat-down search. The officers admitted neither feeling threatened nor believing that the defendant was armed and dangerous. The cooperative defendant did not attempt to escape.
>
> * * *
>
> Officer Simenson *** never testified that he believed the defendant was armed or dangerous. Five officers were on the scene of this search and three had their guns drawn as the search ensued. This conduct exhibits a clear abuse of police discretion." 161 Ill. App. 3d at 192-93.

The only persons testifying at the motion to suppress were Officer Simenson and defendant. During the People's cross-examination of Officer Simenson, the following question was posed: "When you stopped that vehicle and made the pat-search on weapons for Mr. Galvin [defendant], was that in order to protect your own safety?" Officer Simenson responded "yes." Officer Simenson was never asked to specifically state what rea-

sons existed which would lead a prudent person to reasonably believe that in the circumstances which existed at the time of the search, an officer would be warranted in the belief that his safety or that of others was in danger. The appellate court had before it the following finding of the circuit court: "The record is absolutely devoid of any *** objective evidence that would indicate that the defendants, or either of them, was armed or dangerous *** to the safety of the officers making the stop." The answer "yes" by Officer Simenson to the People's question does not rise to the level of specific and articulable facts necessary to justify a search for weapons.

Although the majority phrased its holding in such a way as to allow for the interpretation that the officer's subjective feelings could control the outcome of the validity of the search, we find that the majority did not so hold. Had the majority done this, they would have had to rely exclusively on Officer Simenson's one-word answer to a leading question to prove that the totality of the circumstances were such that a reasonable person would be warranted in the belief that the officers were in danger. Instead, the majority relied on all the testimony given by Officer Simenson and defendant, and concluded that the circuit court was not manifestly erroneous in finding that a reasonable person would not be warranted in the belief that he or she was in danger by this defendant who was surrounded by five police officers, three of whom had their guns drawn.

The People also argue that this court's opinion in *People v. McGowan* (1977), 69 Ill. 2d 73, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624, requires a reversal of the appellate court. For the reasons developed below, we disagree.

Initially, we note that warrantless searches are generally considered unreasonable unless they fall within "a few specifically established and well-delineated excep-

tions." (*Katz v. United States* (1967), 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514.) One of the exceptions is the protective frisk for weapons recognized in *Terry* and section 108—1.01 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 108—1.01). Warrantless searches are the exception, however, and not the rule.

> "[I]n most instances failure to comply with the warrant requirement can only be excused by exigent circumstances [citations]. But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Terry*, 392 U.S. at 20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879.

The scope of a search for weapons must be " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." (*Terry*, 392 U.S. at 19, 20 L. Ed. 2d at 904, 88 S. Ct. at 1878, quoting *Warden v. Hayden* (1967), 387 U.S. 294, 310, 18 L. Ed. 2d 782, 794, 87 S. Ct. 1642, 1652.) "The sole justification of the search *** is the protection of the police officer and others nearby," it is not to gather evidence. (*Terry*, 392 U.S. at 29, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884.) "The manner in which the *** search [was] conducted is, of course, as vital a part of the inquiry as whether [it was] warranted at all." (*Terry*, 392 U.S. at 28, 20 L. Ed. 2d at 910, 88 S. Ct. at 1883.) The conduct of the police officer which was scrutinized in *Terry* was found to be "the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *Terry*, 392 U.S. at 28, 20 L. Ed. 2d at 910, 88 S. Ct. at 1883.

With these principles in mind, we find *McGowan* to be dissimilar to the case at bar. *McGowan* involved the limited pat-down of the defendant and his companion by two police officers at 12:50 a.m. in a deserted commercial and industrial area of Peoria which had a high crime rate. The two men appeared to have emerged from an area between the Hiram Walker building and an adjoining lot. Both were wearing dark clothes. They were in an area at a time when pedestrian traffic was rare. The only business, a tavern 10 minutes away from closing time, was several blocks away.

The officer testified that he stopped the two men because of their dark clothing and the hour of the night; the officer's knowledge of the area had led him to conclude that the men either had just committed or were about to commit a burglary. This conclusion was supported by the unrebutted evidence of a high number of burglaries which had occurred in the area. The officer testified he patted-down the defendant's clothing for weapons because he suspected the defendant to be a burglar and believed that many burglars carry dangerous weapons.

The officer approached the defendant and his companion, identified himself, and explained he was "checking them out" because they were in an area plagued by a high burglary rate. This search produced a gun. The circuit court denied the defendant's motion to suppress, and the appellate court affirmed. This court affirmed. Even though this court found *McGowan* to be a close case, it was unable to find that the circuit court's decision to deny defendant's motion to suppress was against the manifest weight of the evidence. *McGowan*, 69 Ill. 2d at 79.

In *McGowan*, the appellate court said, "The encounter *** was devoid of harassment or intimidation. *** Significantly, the encounter did not subject McGowan to

a loss of dignity \*\*\*." (*People v. McGowan* (1977), 45 Ill. App. 3d 61, 64-65.) This court said in *McGowan* that the facts and circumstances known to the officers "must lead to the conclusion that the situation confronting the police officer is so far removed from the ordinary that any competent police officer would be expected to act quickly to maintain the status quo, rather than to observe the situation further." *McGowan*, 69 Ill. 2d at 78.

This court noted that the suspects in *McGowan* might have eluded the officer had the officer attempted to observe the two suspects further rather than stopping them immediately. The actions of the officer were the "tempered act" of a police officer confronted with circumstances which, while raising the officer's suspicions, did not rise to the level of probable cause. It is in precisely such a situation, where there are reasonable grounds to believe that there is a need for immediate investigatory action, that the constitutional standards and safeguards of *Terry v. Ohio* come into play.

The situation in the instant case is markedly different. If any "immediate action" were required, it was during the hour when the Crest Hill officers had defendant and Percy Unger under surveillance. Instead of exercising authority to maintain the status quo while investigating defendant's suspicious behavior, the Crest Hill officers followed defendant two to three miles outside of the Chaney area under surveillance. The stop was far removed from the location where defendant's activities gave rise to the police officers' suspicions. There were no exigent circumstances necessitating immediate action when the five officers used the three police cars with sirens blaring and lights flashing to stop defendant for investigatory purposes. In fact, the circuit court found:

> "[T]he manner in which [the search] was conducted, being that the officers exited their vehicles with guns drawn, asked no investigatory questions \*\*\* prior to

slapping them up against the car and patting them down for weapons *** belie the claim that it was an investigatory stop."

The People assert that in *McGowan*, this court made its own finding that it is objectively reasonable for an officer to conclude that a burglary suspect is armed and dangerous thereby justifying a frisk every time a police officer legitimately stops a burglary suspect. The People, and the dissent below, point to the following language in support of this argument:

"It is not unlikely that a person engaged in stealing another person's property would arm himself against the possibility that another person will appear unexpectedly and object strenuously. Thus, since we find [the officer's] original suspicion to have been reasonable, we also find it reasonable for him to have concluded that the defendant was armed." *McGowan*, 69 Ill. 2d at 79.

This language, however, must be read in the factual context which gave rise to the issue confronted by this court in *McGowan*. Had the factual context in *McGowan* been different, the reasonableness of the officer's conclusion might very well have been different.

The above-quoted language may not be used by the People to stand for the proposition that every time a burglary suspect is lawfully stopped pursuant to section 107—14, a legal presumption exists that the suspect is armed and dangerous, thereby automatically authorizing a search pursuant to section 108—1.01. No such hard and fast rule may exist. In evaluating the validity of an officer's protective conduct under *Terry*, the "touchstone of our analysis *** is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 108-09, 54 L. Ed. 2d 331, 335, 98 S. Ct. 330, 332, quoting *Terry v. Ohio* (1968), 392 U.S. 1, 19, 20 L. Ed. 2d 889, 904, 88 S. Ct. 1868,

174

1878; see also *People v. Williams* (1974), 57 Ill. 2d 239, 246 (whether a search is reasonable must depend on the particular facts of the case).

Each case must stand or fall on its own set of concrete facts. Of particular significance in this case is the fact that Officer Simenson at no point articulated any specific fact which would have led a reasonably prudent person in the circumstances to have been "warranted in the belief that his safety or that of others was in danger. [Citations.]" *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.

We do not find the circuit court's decision to allow defendant's motion to suppress to have been against the manifest weight of the evidence. (*People v. Winters* (1983), 97 Ill. 2d 151, 158.) For the reasons given, the judgments of the appellate and circuit courts are affirmed.

*Affirmed.*

STAMOS and CALVO, JJ., took no part in the consideration or decision of this case.