THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
DARWIN SULLIVAN, Defendant-Appellee.
Fourth District   No. 4—90—0457

Opinion filed February 28, 1991.

Donald M. Cadagin, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel D. Yuhas and M. Jeffrey Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant Darwin Sullivan was charged with four counts of first-degree murder and one count of aggravated battery. The trial court granted defendant's motion to suppress oral statements given to the Springfield police on January 3, 1990. The State appeals the suppression order, arguing defendant's *Miranda* rights were not violated because police officers ceased interrogating defendant after he requested an attorney. We affirm.

The following facts are undisputed. Defendant, 18 years old on January 3, 1990, turned himself in to the Springfield police on January 3 after hearing he was a suspect in the murder of Michael Dent on January 1, 1990. Defendant arrived at the police station with his mother and a family friend, Adrian Dotts. Defendant, his mother, and Dotts were escorted to the office of Detective Mann. Detective Natale of the Springfield police department joined Mann in his office. There, Mann advised defendant of his *Miranda* rights. Defendant stated he under-

stood his rights. Before defendant said anything else, Mann began to ask defendant questions about the murder of Dent. Before defendant responded to Mann's questions, defendant's mother and Dotts stated defendant wanted a lawyer present during questioning. Defendant then stated he wanted a lawyer present during questioning. Mann discontinued the questions and stated defendant would be transported to the Sangamon County jail. Defendant's mother and Dotts stated they and defendant were treated well by the officers and the atmosphere was calm and not intimidating. Defendant was upset while at the station and he cried at times. Defendant's mother and Dotts left the station before defendant was transported to the jail. Defendant was finally transported to the jail 1½ hours after defendant's mother and Dotts left the station.

The parties dispute the events which occurred before defendant was transported to the jail and while he was at the police station. Detective Natale testified there was a delay in the arrival of the transport vehicle for defendant. While waiting for the vehicle in Mann's office, Natale began to talk to defendant about Harvard Park School, a school for troubled children where defendant was enrolled when he was younger. Natale did not ask defendant any questions about the murder of Dent.

Natale testified defendant made several statements in the following order and these statements were written down verbatim and included in Natale's report:

> "I was laying down. I had no reason to kill that boy. I never talked to him. I knew him but not as a friend. If I get out of this, I am going straight. I didn't come to the party to see Michael. I came looking for Cheek."

Natale reported no comments or questions were directed to defendant before and after any of the above statements. Natale stated defendant then said he turned himself in to the police because he was afraid his mother's house would be shot up. Defendant then stated, "I am a vice lord," and Natale asked him what that statement was in reference to. Defendant then stated the following:

> "The boy was bleeding heavily. All I got on my mind is the murder. I can't eat or sleep. When I am sentenced to twenty or thirty years I am going to cry hard. I just wish I could rewind this and do it over. I can only turn to God now."

Natale again stated no questions or comments were directed to the defendant before or after any of the above statements.

After defendant's last statement, Natale asked defendant if it had been awhile since he had been to church. Defendant then stated he wanted to be thrown in jail and:

"I have a temper and people come up to me and I look at them and I know that they are thinking—what they are thinking, and they whisper about me and I start to fight with them. I have a temper."

On cross-examination, Natale stated a few comments were made in the 20 minutes before defendant made his first statement. Natale reported there was a lot of time when nothing was said at all. Natale and/or Mann stayed with defendant the entire time before he was transported to the jail. Natale and Mann talked between themselves at times, and Mann dictated a report over the phone about the defendant. Natale testified he did comment to defendant about his tattoo. Natale did not recall there being any photographs on Mann's desk. Natale did not tell defendant he was writing down his statements or that the statements could be used against him.

Detective Mann testified he expected the transport of defendant to the county jail would take only 15 to 20 minutes. While waiting, Mann stated he did not ask defendant any questions regarding the case. Mann recalled commenting to defendant that he (Mann) had stopped at defendant's mother's house the night before to discuss the warrant issued for defendant's arrest. Mann told defendant his mother was a nice and good person. Mann started to ask defendant some booking questions before Natale mentioned Harvard Park School to the defendant. Mann testified no questions or comments were made to defendant as he made his statements. Mann stated Natale's report, setting forth all of defendant's statements, was accurate. Mann recalled defendant said something to himself that he would be okay according to the rules of the Vice Lords. Mann stated he called the county jail in defendant's presence to ask for isolation as defendant requested. Mann recalled defendant was emotionally distraught and crying while he was in his office.

On cross-examination, Mann recalled Natale remarked to the defendant that he (defendant) had come a long way since Harvard Park and it was possible the statement about Harvard Park led to the defendant's statement about the Vice Lords. Mann recalled having photos on his desk of defendant and another man, Michael Thompson, but not when defendant was in the office. Mann did not recall saying to the defendant that his friends were not helping him. On redirect examination, Mann stated he was unhappy about the delay in transporting defendant to the jail. Mann clarified for the court that booking questions were asked after *Miranda* rights were given and the transport vehicle was called for and before the discussion about Harvard Park School. The information about defendant's tattoo was elicited during the booking questions.

Defendant testified that after his mother left, Mann and Natale asked him if he knew Michael Thompson, the person in a picture on Mann's desk. Defendant responded he knew Thompson and he asked the officers whether Thompson had been to the station. Mann responded that Thompson had just left the station with his father and stated defendant's friends did not seem to be helping him in this case and they (the police) could not help defendant unless he helped himself. Defendant repeated he did not want to talk to the police without a lawyer. Mann and Natale then offered defendant a candy bar and a soda.

Defendant recalled the conversations about Harvard Park and his tattoo. In response to a question as to whether any conversation took place before defendant made the statements recorded, defendant stated:

> "It was sectioned out during the time I was there. I was more into myself than I was with them and little things—little questions that had come up, not—it was—like I said, it was sectioned out. He asked one thing but, you know, it's like he was tapping around me."

Defendant admitted the statement, "I had no reason to kill that boy" was not made in response to any question from the officers. Defendant stated Mann and Natale did not direct a question to him but they were "tapping around me." Defendant stated the officers said to him: "You need to talk to us in order for us to clear everything up and help you out."

On cross-examination, defendant recalled that after he said "I had no reason to kill that boy," the officers said "[Y]ou can't prove it to us, you have got to prove it to the jury." Defendant denied making the statements about knowing the victim, going straight, and looking for Cheek. Defendant did not recall the statement about the victim bleeding heavily or the statement about his rights under the Vice Lords' constitution. After defendant made his statement about why he turned himself in, defendant reported the officers told him it was a good thing he turned himself in because there were a lot of trigger-happy guys looking for him. Defendant recalled that before he said "All I got on my mind is the murder," the officers said to him, "You are pretty upset. We can tell that you are pretty upset." Defendant stated he did make some statements on his own but it all started with questions from the officers.

During the suppression hearing, the trial judge indicated *Miranda* does not allow that any questions, including booking questions, be asked of a defendant who invokes his *Miranda* rights. Following the hearing, the trial court granted defendant's motion and specifically relied upon *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct.

2093, and *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.

■ In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court held that where a defendant wishes to remain silent before police officers, the interrogation must cease. Further, if a defendant indicates he wants an attorney, the interrogation must cease until the attorney is present. The *Miranda* Court also stated volunteered statements of any kind are not barred by the fifth amendment. (*Miranda*, 384 U.S. at 478, 16 L. Ed. 2d at 726, 86 S. Ct. at 1630.) In *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682, the court determined "interrogation" refers to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a defendant.

In *Edwards*, the defendant requested an attorney, all questioning ceased, and he was taken to the county jail. The next morning, two detectives went to the jail to visit the defendant. Defendant again stated he did not want to talk but was told he "had" to. Defendant was advised of his *Miranda* rights again. He then stated he was willing to talk but first wanted to hear the taped statement of his accomplice who implicated him. Defendant then implicated himself in the crime. The Arizona State courts found defendant had voluntarily and knowingly waived his right to counsel during the meeting with police wherein he implicated himself. The Supreme Court reversed, finding the lower courts failed to consider whether the defendant's waiver was not only voluntarily but knowingly and intelligently entered. The Court also held:

> "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused *** having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards*, 451 U.S. at 484-85, 68 L. Ed. 2d at 386, 101 S. Ct. at 1884-85.)

In *Roberson*, the Supreme Court held the *Edwards* rule applies where the police-initiated interrogation following a suspect's request for counsel occurs in the context of a *separate investigation*.

The State argues the trial court erred in suppressing defendant's statements because there was no police-initiated interrogation of defend-

ant following the invocation of his right to an attorney. Rather, the defendant volunteered his statements. The State also argues the trial judge erred in stating no booking questions may be asked after a defendant has requested an attorney.

Resolution of the issue raised by the State requires a determination of who initiated a conversation between the officers and defendant after defendant invoked his *Miranda* rights and before he was transported to the county jail. The evidence on this issue is disputed. According to the State's witnesses, defendant began to voluntarily give statements after some booking questions and a statement from Detective Natale on an unrelated matter (Harvard Park). According to defendant, the officers initiated a conversation with him by asking him if he recognized a person in a photo who was reported to be related to the case. Further, while defendant admitted that some of his statements were not made in response to specific questions from the officers, he also stated the "whole thing" started with questions from the officers.

██ At a suppression hearing, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) The trial court's determination on a motion to suppress will not be overturned unless it is manifestly erroneous. *People v. Galvin* (1989), 127 Ill. 2d 153, 162, 535 N.E.2d 837, 841.

██ ██ We conclude the evidence supports the trial court's order. The trial court found the defendant's testimony was more credible than that of the State's witnesses and concluded the police initiated an interrogation of defendant by asking him about a photograph related to the case. We will not disturb the trial court's finding on a disputed fact. On a related matter, we note, however, that our supreme court in *People v. Dalton* (1982), 91 Ill. 2d 22, 434 N.E.2d 1127, held booking questions are not prohibited by *Miranda*.

For the foregoing reasons, the order of the trial court is affirmed.

Affirmed.

LUND, P.J., and SPITZ, J., concur.