# Illinois Official Reports

## Appellate Court

---

### *People v. Claypool*, 2014 IL App (3d) 120468

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TERRANCE D. CLAYPOOL, Defendant-Appellant. |

| | |
|---|---|
| District & No. | Third District<br>Docket No. 3-12-0468 |

| | |
|---|---|
| Rule 23 Order filed<br>Motion to publish<br>allowed<br>Opinion filed | October 2, 2014<br><br>October 30, 2014<br>October 30, 2014 |

| | |
|---|---|
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of defendant's motion to suppress the cocaine discovered following a *Terry* stop and frisk was affirmed on appeal, where a police officer observed defendant just before 1 a.m. in an area where burglaries were not uncommon, the man was trying the handles of a vehicle parked on the street, and during the struggle that ensued when the officer confronted him, the man ran away, but after the officer alerted other officers and caught the man, he spit a white object out of his mouth and pushed it into a storm drain, and after the object was recovered, it was identified as cocaine, and under those circumstances, it was reasonable for the officer to believe defendant had committed or was about to commit a burglary and to suspect that he was in danger of attack. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 11-CF-64; the Hon. Clark E. Erickson, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Kieran M. Wiberg (argued), both of State Appellate Defender's Office, of Chicago, for appellant. |
| | Jamie J. Boyd, State's Attorney, of Kankakee (Thomas D. Arado (argued), of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion. <br> Justice Holdridge specially concurred, with opinion. <br> Justice Schmidt specially concurred, with opinion. |

**OPINION**

¶ 1    Defendant, Terrance D. Claypool, appeals from the circuit court's order denying his motion to suppress. Defendant argues his motion to suppress should have been granted because the police officer "lacked reasonable suspicion to seize him and order him to submit to a pat-down search." We affirm.

¶ 2                                   FACTS

¶ 3    Defendant was seized by Chris Benoit of the Kankakee police department in the early morning (12:48 a.m.) of January 30, 2011. Benoit ordered defendant to submit to a pat-down search and a struggle ensued. When defendant was taken into custody a short time later, police found 7.8 grams of cocaine in a nearby storm drain, which Benoit testified defendant spit out of his mouth and pushed into the drain. As a result of this encounter, defendant was charged with possession of a controlled substance with intent to deliver. Defendant was convicted and sentenced to 15 years' imprisonment.

¶ 4    Prior to trial, defendant filed a motion to suppress. Defendant and Benoit both testified at the hearing on defendant's motion. Both parties acknowledge, however, here on appeal that Benoit's testimony is the only reliable testimony due to the fact that defendant previously admitted that he perjured himself with regard to his testimony at the suppression hearing. Thus, our discussion is limited to Benoit's testimony.

¶ 5    Benoit testified that he was in his squad car when he saw a man, approximately a block ahead of him, who appeared confused. Benoit identified defendant as that man. Defendant was standing in the street looking into the driver's side of a parked vehicle and trying the handles of the vehicle. Benoit thought defendant was attempting to access the vehicle but he did not believe defendant's behavior was suspicious because he thought defendant might be locked out of the vehicle. There were no other vehicles parked in the immediate area.

¶ 6        After attempting to gain access to the vehicle's trunk, defendant made no effort, with or without tools, to forcibly enter the car. Instead, he simply walked away from the vehicle. He did not, however, go into the residence directly north of where the car was parked but, rather, continued walking. Once defendant passed the house, Benoit became suspicious as car burglaries were not uncommon in the area.

¶ 7        Benoit began to follow defendant and saw him turn and look in his direction, at which point defendant appeared to slightly change direction and walk down an alley. Benoit stopped his squad, stepped out and called out for defendant to "hold on a second." Defendant turned and leaned forward, as if to run, and fell down.

¶ 8        Benoit jogged over to defendant and helped him stand. Benoit testified that when he approached defendant he believed defendant had been "attempting to illegally gain entry to the vehicle." Benoit asked defendant if he was trying to run and defendant responded that he had just slipped on some ice. Benoit testified this explanation was "plausible." Benoit did not inquire as to defendant's actions regarding the vehicle he saw defendant attempting to access. Instead, Benoit "escorted" defendant to the squad car and ordered him to place both hands on the hood of the car so that Benoit could pat him down for "[w]eapons or possibly burglary tools." Benoit stated that it would not be unexpected to find people who break into cars having some burglary tools or screwdrivers that could be used as a weapon.

¶ 9        Defendant put his right hand on the hood of the squad car but kept his left hand near his waist. Benoit again ordered defendant to place both hands on the hood of the squad. Instead of complying, defendant began to move his right hand off the squad and toward his waist. Benoit thought defendant was reaching for a gun in his waistband. A struggle ensued, during which defendant slipped out of his jacket and ran away. Benoit testified there was not much time between when he helped defendant up in the alley and when defendant fled. Benoit alerted other officers, then caught up with defendant and took him into custody. As he did so, he saw defendant spit a whitish object out of his mouth and push it into a nearby storm drain. Such an object was recovered by another officer and was ultimately identified as 7.8 grams of cocaine.

¶ 10        On cross-examination, Benoit indicated he did not demand an explanation of defendant's attempts to access the vehicle because there was not time between helping defendant up and escorting him to the squad car. Benoit stated that "based on all the actions that I had observed, I thought he might possibly have burglary tools or possibly a weapon or something that could be used as a weapon."

¶ 11        Defendant was not charged with attempted burglary and no burglary tools or other possible weapons were found in his possession. He was instead charged with drug possession with intent to deliver. He moved to suppress the drugs found as a result of the *Terry* stop and frisk–a motion that the circuit court ultimately denied. The matter proceeded to trial and defendant was convicted and sentenced to 15 years' imprisonment. Defendant appeals the denial of his motion to suppress.

¶ 12                                    ANALYSIS

¶ 13        Defendant argues his motion to suppress should have been granted because "Benoit lacked reasonable suspicion to seize him and order him to submit to a pat-down search." We disagree.

¶ 14        We review a trial court's ruling on a motion to suppress evidence pursuant to a two-part test. *People v. Absher*, 242 Ill. 2d 77, 82 (2011). First, we will uphold the court's factual

findings unless they are against the manifest weight of the evidence. *Absher*, 242 Ill. 2d at 82. Second, we assess the established facts in relation to the issues presented and review the ultimate legal question of whether suppression is warranted *de novo*. *Absher*, 242 Ill. 2d at 82.

¶ 15    In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court provided an exception to the warrant and probable cause requirements. "Under *Terry*, a police officer may conduct a brief, investigatory stop of a person where the officer reasonably believes that the person has committed, or is about to commit, a crime." *People v. Close*, 238 Ill. 2d 497, 505 (2010). In Illinois, the "*Terry* stop" has been codified under section 107-14 of the Code of Criminal Procedure of 1963 (Code), as follows:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense *** and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." 725 ILCS 5/107-14 (West 2010).

¶ 16    Additionally, under *Terry*, "if the officer reasonably believes that the person questioned may be armed and dangerous, the officer may conduct a limited pat down search for weapons, commonly called a frisk." *People v. Love*, 199 Ill. 2d 269, 275 (2002). The "*Terry* frisk" has also been codified in Illinois under section 108-1.01 of the Code, as follows:

> "When a peace officer has stopped a person for temporary questioning pursuant to Section 107-14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons." 725 ILCS 5/108-1.01 (West 2010).

¶ 17    The only questions before us are: (1) whether it was reasonable for Benoit to infer that defendant had committed or was about to commit a burglary; and, if so, (2) whether it was reasonable for Benoit to suspect that he was in danger of attack upon stopping defendant.

¶ 18    We believe it was reasonable for Benoit to infer that defendant had committed or was about to commit a burglary. Benoit observed defendant attempting to gain access to a vehicle at 12:48 a.m. in an area where burglaries were not uncommon. Defendant checked the door handles of the vehicle, stepped back, looked around, and then checked the handles again, along with the vehicle's trunk handle. No other vehicles were in the area. Although Benoit initially thought defendant may have been locked out of the vehicle, his suspicions were heightened when defendant walked past the residence where the vehicle was parked. When defendant saw Benoit, defendant changed direction and headed down an alley. While defendant may have simply fallen on ice when Benoit subsequently told him to "hold on a second," it is just as "plausible" that defendant was in fact attempting to run. Benoit expressly testified that when he approached defendant he believed defendant had been "attempting to illegally gain entry to the vehicle." Based on the totality of the circumstances, a *Terry* investigatory stop was justified.

¶ 19    We also believe it was reasonable for Benoit to suspect that he was in danger of attack upon stopping defendant. Benoit testified he conducted a "*Terry* frisk" for "[w]eapons or possibly burglary tools." Benoit explained that it would not be unexpected to find people who break into cars having some burglary tools or screwdrivers that could be used as a weapon. Likewise, it is also not unreasonable to suspect that a burglar could have a knife or firearm concealed on his person. While defendant argues that Benoit could have simply asked defendant what he was doing at the vehicle, as opposed to "escorting" him back to the squad car, we note that Benoit

testified there was not much time between when he helped defendant up and when defendant fled. We do not believe Benoit unreasonably prolonged the stop. Moreover, because the belief that defendant may have been armed was reasonable, Benoit had the right to conduct a "*Terry* frisk." Benoit's right to conduct such a frisk does not stem from any potential discussion with defendant. Instead, it stems from the fact that the totality of the circumstances created a reasonable inference that defendant may have been involved in a burglary and therefore may have been carrying knife, firearm or other burglary tool that could have been used as a weapon.

¶ 20 The above conclusion is supported by the holding in *People v. McGowan*, 69 Ill. 2d 73 (1977). The *McGowan* court upheld a "*Terry* stop" and "*Terry* frisk" based upon an officer's testimony that he suspected the defendant to have been an armed burglar. The police officer saw the defendant and his companion dressed in black, at 12:50 a.m., in a deserted commercial and industrial area that had been plagued by burglaries. There was only one establishment open in the area and that was a tavern that was due to close at 1 a.m., 10 minutes after the defendant and his companion were spotted. These were the *only* facts analyzed with regard to the viability of the stop and frisk. The supreme court held:

"Thus, while it is possible that the defendant and his companion were merely on their way to Penn's Tavern to have a fast drink before closing time, we agree that it was much more likely that persons dressed in black, walking in the dead of night through an otherwise deserted commercial and industrial area which had been plagued by burglaries, had just committed or were about to commit a burglary. Under these circumstances, the suspects easily might have eluded the officers had the officers attempted to observe the two suspects further rather than stopping them immediately. Hence, we agree that [the officer's] inference of an imminent or recent burglary was reasonable, and that stopping the defendant therefore was reasonable under the circumstances." *McGowan*, 69 Ill. 2d at 78-79.

¶ 21 The court further held:

"We also hold that it was reasonable for [the police officer] to suspect that he and his partner were in danger of attack. It is not unlikely that a person engaged in stealing another person's property would arm himself against the possibility that another person will appear unexpectedly and object strenuously. Thus, since we find [the officer's] original suspicion to have been reasonable, we also find it reasonable for him to have concluded that the defendant was armed. It follows inevitably, we think, that it also was reasonable for [the officer] to assume that if the man he stopped were an armed burglar, he would not submit peacefully to questioning. Certainly [the officer] was not required to risk his life and that of his partner by assuming the contrary. [Citation.] The limited weapons search therefore also was reasonable." *McGowan*, 69 Ill. 2d at 79.

¶ 22 Lastly, *People v. Porter*, 2014 IL App (3d) 120338, and *People v. Kipfer*, 356 Ill. App. 3d 132 (2005), the cases relied upon by defendant, are distinguishable.

¶ 23 The *Porter* court determined that a police officer was not permitted to conduct a "*Terry* frisk" because the officer had no reason to believe that the defendant was armed and dangerous. *Porter*, 2014 IL App (3d) 120338, ¶ 16. The officer in *Porter* received a report of an offender wanted for a home invasion. The defendant matched the victim's description and was seen leaving the crime scene. While the *Porter* court found that the "*Terry* stop" of defendant was valid in light of the above facts, it held the subsequent "*Terry* frisk" was improper because: (1) the officer did not articulate any reasons that would lead a reasonably

prudent person to believe his safety was in danger, and (2) the victim of the home invasion reported that the suspect had a cell phone, but did not report any weapon. *Porter*, 2014 IL App (3d) 120338, ¶ 16. Unlike the officer in *Porter*, Benoit specifically testified as to why he believed his safety was in danger–"It wouldn't be unexpected to find some burglary tools or screwdrivers, that sort of thing, that could possibly be used as a weapon." The *McGowan* court expressly upheld this reasoning. *McGowan*, 69 Ill. 2d at 79.

¶ 24     The *Kipfer* court found a police officer lacked reasonable articulable suspicion for a "*Terry* stop" when, at 3:30 a.m., he saw the defendant come out from behind a dumpster and walk through the parking lot of an apartment complex. *Kipfer*, 356 Ill. App. 3d at 140. Unlike the instant case, the defendant in *Kipfer* was not repeatedly attempting to gain access to a vehicle while looking around to see if anyone noticed. Moreover, the defendant did not immediately change direction and head into an alley when noticing a police presence. Finally, defendant did not attempt to *possibly* run when the officer asked him to stop.

¶ 25     For the foregoing reasons, we affirm the circuit court's judgment.

¶ 26     Affirmed.

¶ 27     JUSTICE HOLDRIDGE, specially concurring.

¶ 28     I concur in the judgment and I agree with the majority's analysis regarding the "*Terry* stop." I write separately to clarify the analysis governing the frisk issue. "[W]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others, the officer may conduct a pat-down search [or frisk] to determine whether the person is in fact carrying a weapon." *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001); see also *People v. Porter*, 2014 IL App (3d) 120338, ¶ 15. The officer need not be absolutely certain that the individual is armed; the issue is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Sorenson*, 196 Ill. 2d at 433; see also *Porter*, 2014 IL App (3d) 120338, ¶ 15. In determining whether the officer acted reasonably in such circumstances, "due weight must be given to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Sorenson*, 196 Ill. 2d at 433. However, the reasonableness of a frisk must be judged by all the particular facts and circumstances surrounding it, and "[e]ach case must stand or fall on its own set of concrete facts." *People v. Galvin*, 127 Ill. 2d 153, 173-74 (1989). Accordingly, a frisk may not be justified by resort to a blanket legal presumption that all persons reasonably suspected of committing a burglary are armed and dangerous. *Galvin*, 127 Ill. 2d at 173; *People v. Flowers*, 179 Ill. 2d 257, 269-70 (1997).[1]

---

[1]Although there is language in *People v. McGowan*, 69 Ill. 2d 73, 79 (1977), that appears to support such a legal presumption, our supreme court categorically rejected such a presumption in *Galvin*. Moreover, the supreme court noted that *McGowan* had to be read in its factual context (which included the fact that the suspects were stopped shortly before 1 a.m. in an area that had "suffered a number of burglaries" (*id.* at 75)), and that, "[h]ad the factual context in *McGowan* been different, the reasonableness of the officer's conclusion [that the defendant was armed] might very well have been different." *Galvin*, 127 Ill. 2d at 173.

¶ 29       In this case, Officer Benoit testified that he stopped the defendant shortly before 1 a.m. in an area where burglaries were not uncommon. Based on the defendant's behavior, Benoit reasonably suspected that the defendant was attempting to burglarize a parked car. Benoit was alone and on foot when he confronted and frisked the defendant. At the suppression hearing, Benoit testified that, based on his experience, "it wouldn't be unexpected to find some burglary tools or screwdrivers [on the defendant] *** that could possibly be used as a weapon." Considering all these facts, and giving due weight to the reasonable inferences that Benoit was entitled to draw based on his experience, I conclude that a reasonably prudent police officer in these circumstances would be warranted in the belief that his safety was in danger.

¶ 30       Justice McDade correctly observes that this case is distinguishable from *Porter*, wherein there was no police testimony or other evidence to support a reasonable inference that the suspect was armed and dangerous. The only evidence that could possibly support such an inference in *Porter* was the fact that the defendant was suspected of committing a home invasion. Our supreme court has made clear that such evidence, standing alone, is insufficient to justify a *Terry* frisk. *Galvin*, 127 Ill. 2d at 173. According to our supreme court, there must be additional facts suggesting that the suspect might be armed and dangerous or some other evidence suggesting that the police officer reasonably feared for his safety under the circumstances. *Sorenson*, 196 Ill. 2d at 437; *Galvin*, 127 Ill. 2d at 173-74. Because there was no such additional evidence in *Porter*, binding supreme court precedent required our appellate court to hold that the frisk in that case was unlawful. Thus, unlike Justice Schmidt, I believe that *Porter* was correctly decided under the law. However, because there was additional evidence in this case suggesting that Benoit reasonably feared for his safety, I agree with the majority that the frisk at issue here was legal and justified.

¶ 31       In any event, even if I were to conclude that both the stop and the frisk in this case were unlawful, I would still affirm the denial of the defendant's suppression motion. While Benoit attempted to frisk the defendant, the defendant struggled with him, slipped out of his jacket, and ran away. As the defendant fled, Benoit saw a whitish object in the defendant's hand. Benoit chased after the defendant and pushed him to the ground. As he did so, he saw the defendant spit the whitish object (later identified as cocaine) out of his mouth and push it into a nearby storm drain. Thus, Benoit discovered the cocaine during the defendant's flight, not during the initial stop or frisk. The defendant's flight "ended the seizure," and "anything happening thereafter was, by its very nature, no longer tied to the initial stop." (Internal quotation marks omitted.) *People v. Henderson*, 2013 IL 114040, ¶ 37. Put another way, the defendant's flight interrupted the connection between any allegedly improper action by Benoit (which could not possibly be characterized as "flagrant") and the discovery of the cocaine. *Henderson*, 2013 IL 114040, ¶ 50; see also *People v. Keys*, 375 Ill. App. 3d 459, 464 (2007) (affirming denial of defendant's motion to suppress drugs discovered during his flight from police and reasoning that, even if the initial seizure and attempted pat-down of the defendant were unlawful, the drugs were not recovered through exploitation of that initial illegality but were discovered as a result of the defendant's subsequent escape and abandonment of the drugs). Thus, even assuming *arguendo* that the initial stop and frisk were illegal, the defendant cannot show that the discovery of the cocaine was the product of those illegal acts (or the "fruit of the poisonous tree") and thereby subject to the exclusionary rule. For this additional reason, I would affirm the trial court's denial of the defendant's motion to suppress.

¶ 32       JUSTICE SCHMIDT, specially concurring.

¶ 33       I concur, but write separately simply to point out that I believe *Porter* was wrongly decided.