# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Walker*, 2013 IL App (4th) 120118

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MINDI L. WALKER, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-12-0118 |
| Filed<br>Rehearing denied | August 13, 2013<br>October 2, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's conviction for driving while under the influence of cannabis, the trial court's denial of defendant's motion to suppress the evidence discovered in a search of her purse was reversed, since the officers involved had no reasonable belief that defendant was armed and dangerous after her vehicle was stopped in connection with a report that she had just left the scene of an accident, there was no testimony that the purse was searched as a protective measure before allowing defendant to retrieve her identification, and the *Terry* exception to the warrant requirement did not apply; however, the cause was remanded for a determination of the effect of the invalid search of the purse on the admissibility of the other evidence. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 11-DT-268; the Hon. John R. Kennedy, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Daaron V. Kimmel (argued), all of State Appellate Defender's Office, of Springfield, for appellant.

Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, Robert J. Biderman, and Anastacia R. Brooks (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE POPE delivered the judgment of the court, with opinion.

Justices Knecht and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1     In May 2011, the State charged defendant, Mindi L. Walker, with (1) driving under the influence (DUI) based on the presence of cannabis in her urine (625 ILCS 5/11-501(a)(6) (West 2010)) and (2) leaving the scene of an accident resulting in damage to property (625 ILCS 5/11-404 (West 2010)). Defendant filed a motion to suppress evidence and statements, alleging (1) evidence of cannabis ingestion discovered in her purse and car, as well as evidence obtained during the ensuing DUI investigation, were the fruits of a fourth amendment violation, and (2) her alleged statements to a police officer following her arrest were the product of a custodial interrogation and were made before she had been informed of her *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)).

¶ 2     In October 2011, following a hearing, the trial court granted defendant's motion to suppress her alleged statements but denied suppression of all other evidence obtained during, and as a result of, the search of her purse. That same month, defendant consented to a stipulated bench trial for the purpose of preserving her fourth amendment claim, and the State agreed to dismiss the charge of leaving the scene of an accident resulting in damage to property. The court found defendant guilty of DUI and, in December 2011, sentenced her to 24 months of probation, 180 days in jail, 75 hours of public service, and various fines and fees. Defendant appeals, arguing (1) the court erred in denying her motion to suppress all evidence obtained during and as a result of the search of her purse, and (2) this court should reverse her conviction outright because, after suppression is granted, the remaining evidence would be insufficient to sustain a conviction. For the reasons that follow, we agree and reverse the court's denial of the motion to suppress and remand for further proceedings.

¶ 3                              I. BACKGROUND

¶ 4     The following facts were gleaned from (1) evidence presented at the hearing on defendant's motion to suppress, which consisted entirely of the testimony of Detective

Nathan Rath and Sergeant James Rein of the Champaign police department, and (2) the stipulated facts presented at defendant's October 2011 bench trial.

¶ 5 On May 23, 2011, at 12:41 p.m., Detective Rath and Sergeant Rein were on patrol in their unmarked police van when they received a radio dispatch indicating a blue car, with front-end damage and a license plate starting with the letter "H," had struck a light pole in the parking lot of a lumber supply company in Champaign and left the scene. At the time of the dispatch, Rath and Rein were stopped at a red light on Bradley Avenue, at the intersection of Prospect Avenue, facing west. After receiving the dispatch, Rath noticed a blue car with front-end damage and a license plate starting with the letter "H" stopped across the intersection in the eastbound lane of Bradley Avenue. Rath used his radio to notify dispatch he may have located the car involved in the accident. He requested a marked squad car to aid in initiating a traffic stop.

¶ 6 After turning their van around (it is unclear which officer was driving), Rath and Rein followed the blue car, a Chevy Impala, east on Bradley Avenue. Shortly thereafter, Deputy Chief John Murphy of the Champaign police department, who was traveling in a marked squad car, initiated a traffic stop of the blue car near the intersection of Bradley Avenue and Market Street. The car came to a stop in an eastbound lane of Bradley Avenue, immediately west of Market Street, in what Rath described as "the middle of the street." To the immediate left of the car was a left-turn lane, which allowed eastbound traffic to turn north onto Market Street. To the immediate right of the car was an eastbound lane of traffic. Murphy positioned his squad car behind the blue car, leaving approximately six to eight feet of space between the two vehicles. Rath and Rein's van was parked behind Murphy's squad car. Rath testified there was a "significant amount" of traffic.

¶ 7 Sergeant Rein and Deputy Chief Murphy exited their vehicles and approached the driver's side of the blue car, while Detective Rath exited and approached the passenger's side. Two women were in the car. Rein asked the driver, whom he identified at the hearing as defendant, to exit her car and stand in the space between her car and Murphy's squad car. Rein and Rath confirmed defendant was approximately 5 feet 3 inches tall and weighed 90 pounds. In the space between Murphy's squad car and defendant's car, Rein asked defendant for her identification. Defendant told Rein her identification was in her purse, which was in her car. With defendant's permission, Rein retrieved the purse from the car and brought it back to where defendant and Murphy were standing. Rein testified he believed the purse was average-size, with soft sides.

¶ 8 Rein asked defendant if he could retrieve her identification from the purse. Defendant said yes. Rein opened the purse, looked inside, and put his hand into the purse. He could see the contents of the purse "for the most part" and did not see any weapons, nor did he smell anything. Before Rein could find defendant's identification, and before he had time to "feel objects inside" the purse, defendant grabbed the purse away from Rein and held it, but did not reach into it. Rein then took the purse away from defendant, placed it on the trunk of the car, two or three feet away from defendant, and told defendant "not to put her hands in the purse."

¶ 9 Meanwhile, Detective Rath explained to the passenger, Brenda, he was investigating a

possible hit and run. He asked Brenda if the driver had been drinking alcohol, and Brenda said, "No." He did not ask whether the driver had consumed any other substances. Rath also asked Brenda if the car had insurance. Brenda said she did not know, opened the glove compartment, and found a stack of paperwork. Rath offered to look through the paperwork for insurance information, and Brenda handed it to him. While he was talking to Brenda, Rath could not hear the conversation taking place between defendant and the other officers. Rath took the paperwork to the rear of defendant's car, where Rein, Murphy, and defendant were standing, and began looking through the papers.

¶ 10 When asked if he saw defendant making any movements or actions, Detective Rath testified, as follows:

"A. I know that I heard, again, know [*sic*] who said it, but an officer telling her had, or instructing her to quit going towards her purse, to quit, you know, trying to get into her purse, or getting control of her purse. And then I know that her purse had been set down on the back of the trunk, and that she then made another movement to get towards her purse.

Q. Did you see her make the movement?

A. The last one I did. Prior to that I had only heard the officer's instructions.

Q. What did she do?

A. Just made a–she was standing, again just generally behind, between her vehicle and Deputy Chief Murphy's vehicle, speaking, interacting with these officers. And her purse was on the trunk of the car, and she just made a movement to get to her purse with her outstretched arm."

Rath testified Sergeant Rein then placed defendant in handcuffs.

¶ 11 Sergeant Rein testified, after he took the purse away from defendant and set it on the trunk of her car, he instructed defendant to sit on the rear bumper of her car "because she kept trying to get at that purse, kept trying to grab at the purse." Rein then testified, "And she did comply for a few seconds, and then she got up and kept trying to go at the purse, kind of walking around, like anxious. And at that point I made the decision to secure her in handcuffs." Detective Rath was looking through the paperwork when Rein secured defendant in handcuffs behind her back and again seated her on the rear bumper of her car. Rein testified, after defendant was handcuffed and seated, she was unable to reach the purse, which remained on top of the trunk. She did not turn around or attempt to reach for the purse after being handcuffed.

¶ 12 Sergeant Rein testified he observed defendant as being anxious and jittery. Detective Rath initially testified the only thing he observed unusual about defendant's behavior was that she was "generally excited." After refreshing his memory by referring to his police report, Rath recalled defendant was "crying and acting very nervous." He later elaborated, as follows:

"I mean, [defendant's] demeanor was not that of a normal person who had just been in an accident. I mean, granted, she could have been nervous about just having had general contact with the police, she could have been nervous about the fact that she was

just involved in an accident, and left the scene. But she was excited to such a point where, you know, Sergeant Rein felt it was necessary to control her with handcuffs for her safety, to keep her from getting hit, you know, by a car, or getting–stepping out of the lane of traffic. Between her making these–for no reason that we could think of, these movements towards her purse to gain control of her purse, I mean, to me those are actions that would suggest that either something's going on with her. Now does that mean that it's absolutely is she under the influence of drugs or alcohol? No. But does it raise my suspicion that she is? Yes."

¶ 13 Both Detective Rath and Sergeant Rein testified defendant was not under arrest at the time she was placed in handcuffs and seated on the bumper. Rath understood that Rein took the precaution to prevent defendant from accessing her purse or walking out into traffic, "[f]or her safety, to keep her under control." As far as the testimony reveals, none of the officers frisked defendant's person during the course of the encounter.

¶ 14 Detective Rath testified, after Sergeant Rein placed defendant in handcuffs and seated her on the bumper of the car, Rath put down the paperwork and "then went directly to her purse and opened it up, you know, to view the contents of it, to see what is it that she's trying to–why is she trying to gain control of this purse so bad?" Thereafter, on direct examination by defense counsel, Rath testified as follows:

"Q. At that time did you observe anything to indicate that Mindi Walker would have a weapon?

A. No.

Q. Had you received any information that Mindi Walker was involved in any type of offense that would involve a weapon?

A. No.

Q. Did you–before opening it, did you make any effort to feel it?

A. No.

Q. Well, after you–when you opened it, what did you observe?

A. Just general contents of a purse. No weapon, there really was nothing that was standing out of my, you know, in my field of view. I opened it, visually inspected it, didn't see anything that would be of harm to me or any other officers there, and stopped.

Q. Did you–did you notice anything else about the purse after you opened it?

A. Well, I smelled cannabis, or what I believed to be cannabis.

Q. And when did you notice that smell?

A. Almost immediately upon opening it. I mean, I opened it, looked in it, and then got the smell. So based on that description, that was what, two or three seconds; so almost immediately.

Q. And what did you do at that time upon noticing the smell?

A. I then, assuming that it came–you know, because there was no other explanation as to where the cannabis could be from, I then went in and searched for what was producing the smell of cannabis.

Q. At any time before that had you or anyone else, to your knowledge, asked [defendant's] permission to look through the purse?

A. Sergeant Rein had asked her if he could look in her purse for identification. She said yes. But at that time–I'm sorry, at that time I did not know that."

¶ 15 Inside the main pouch of the purse, Detective Rath found (1) a small amount of cannabis in a cellophane wrapper and (2) a small black cosmetic case, which he opened to discover another small amount of cannabis. Rath testified the purse was "medium to large," but he could not recall whether it had hard or soft sides. He made no effort to feel the outside of the purse before opening it. On redirect examination by defense counsel, he confirmed the accuracy of a statement he made in his police report, which read, "I opened the top of her purse to check for the presence of a weapon, or why [defendant] would be making such obvious attempts to get her purse."

¶ 16 Sergeant Rein provided no testimony regarding Detective Rath's search of defendant's purse because he did not see it happen and was unaware of its occurrence until afterward.

¶ 17 After Detective Rath discovered cannabis in defendant's purse, he then searched defendant's car and discovered another small amount of cannabis as well as a "one-hitter" pipe used for smoking cannabis. Rath returned to the rear of defendant's car, showed the cannabis and one-hitter pipe to defendant, and asked who owned the items. Defendant responded the items belonged to her. Rath then asked defendant when she last smoked cannabis, and she told him she had smoked cannabis that morning. (We note the trial court, finding a violation of *Miranda*, granted suppression of defendant's statements. The State did not challenge that ruling and the admissibility of those statements is not at issue in this appeal.)

¶ 18 Detective Rath testified, as noted above, at the time he searched defendant's purse, he had not observed anything to indicate defendant might possess a weapon, nor had he received any information defendant was involved in an offense that might involve a weapon.

¶ 19 After Detective Rath discovered cannabis and defendant admitted possessing cannabis and smoking cannabis that morning, the officers decided to relocate to the parking lot of a retail store on the northeast side of the intersection. Sergeant Rein transported defendant and Brenda to the parking lot in his vehicle. In the parking lot, Rein first learned Detective Rath had discovered items indicating the consumption of cannabis. Based on the discovery of cannabis and defendant's statements, Officers Tom Petrilli and Corey Phenicie of the Champaign police department arrived and initiated a DUI investigation. The stipulated facts presented at defendant's bench trial reveal defendant was determined to be under the influence of drugs and arrested. Samples of defendant's urine were taken, which subsequently tested positive for the presence of tetrahydrocannabinol (THC), a metabolite of cannabis.

¶ 20 The State charged defendant with (1) DUI based on the presence of cannabis in her urine (625 ILCS 5/11-501(a)(6) (West 2010)) and (2) leaving the scene of an accident resulting in damage to property (625 ILCS 5/11-404 (West 2010)).

¶ 21 In September 2011, defendant filed a motion to suppress along with a memorandum of law in support, in which she argued she was deprived of her constitutional rights under the

fourth, fifth, and fourteenth amendments to the United States Constitution (U.S. Const., amends. IV, V, XIV) and article I, sections 2, 6, and 10, of the Illinois Constitution (Ill. Const. 1970, art. I, §§ 2, 6, 10) when (1) her purse was searched without legal justification, leading to the alleged discovery of items that expanded the police investigation to include a cannabis-related DUI offense, and (2) she was subjected to a custodial interrogation without being instructed as to her rights pursuant to *Miranda*, 384 U.S. 436. Defendant requested suppression of "any and all statements and evidence recovered by the Police as a result of the unconstitutional search of [defendant's] purse and vehicle, as well as any statements she allegedly made to the Police in response to custodial interrogation prior to receiving her *Miranda* warnings, and any evidence derived therefrom."

¶ 22 In October 2011, the trial court held a hearing on defendant's motion to suppress. Following the testimony of Detective Rath and Sergeant Rein, defendant argued, in part, she initially gave Rein consent to look in her purse for the purpose of retrieving her identification, but withdrew that consent by taking the purse away from him. Defendant did not argue the handcuffing was unreasonable, but asserted Rath's search of her purse, which led to the initial discovery of cannabis, occurred within the context of a *Terry* stop, not a search incident to arrest. Defendant argued the search of her purse was unreasonable because (1) the officers had no reason to suspect she was armed and dangerous, (2) her hands were secured behind her back, rendering her unable to access the purse, and (3) if the officers were afraid the purse might contain a weapon defendant might access, they should have so determined by feeling the purse from the outside, or simply secured the purse away from defendant's reach.

¶ 23 The State argued, in pertinent part, as follows:

"The officers had a perfectly good reason to go into the purse, and a perfectly constitutional reason to go into the purse, because of the fact that [defendant] kept trying to go into it. Regardless of why they first opened it, as soon as Detective Rath opens that purse and smells the marijuana, he has probable cause to continue to search. In this situation I can't help but feel the defense is grasping at straws. There is a defendant here, who is standing in the middle approximate [*sic*] of the traffic, who is visibly upset and continually goes for a bag. Who knows what's in that bag? ***

What else could have the officers–could the officers have done? Taken this purse and put it in the car and said okay, whatever's in it, despite the fact you continue to go for it, that's okay. Despite the fact that we tell you, leave your purse alone, and yet you continue to grab for it, you continually reach for it, that's okay, don't worry about it.

Your Honor, the officers acted completely correctly, and there were no constitutional violations in this case."

¶ 24 Following the presentation of evidence and argument, the trial court stated its findings, as follows: (1) it was reasonable for the officers to stop defendant and have her exit her car and produce identification; (2) defendant initially gave Sergeant Rein consent to search her purse, but unequivocally withdrew that consent when she took the purse away from him; (3) the action of taking the purse away from Rein "would–in the context of what's happening, give[ ] the officer reasonable and articulable suspicion that this purse can contain a weapon";

(4) "[Detective] Rath, from afar, observe[ed] [defendant] who appear[ed] to be unusually anxious, and unusually anxious about the particular contents of this purse"; (5) the "manner in which [defendant] act[ed] would raise significant suspicion about what's in [the purse]"; (6) defendant made "repeated actions of grabbing for the purse, even at the time when the officers are trying to tell [defendant] not to go for the purse"; (7) the public location of the encounter and the presence of traffic made a difference because, if the purse "contain[ed] some type of a weapon, it can affect the safety of a lot of other persons who are just in the area"; and (8) the purse was big enough to contain a weapon and it could not be determined from the outside whether the purse contained a weapon. In finding the search of defendant's purse permissible, the court denied suppression of the evidence gathered during and after the search of defendant's purse, except the statements suppressed pursuant to *Miranda*.

¶ 25 In October 2011, defendant waived her right to a jury trial and consented to a stipulated bench trial. Defense counsel announced in open court defendant chose that course of action for the purpose of preserving her fourth amendment claim for appeal. See *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 9, 989 N.E.2d 650. The court convicted defendant of DUI (625 ILCS 5/11-501(a)(6) (West 2010)). In December 2011, the court sentenced defendant to 24 months of probation, 180 days in jail (30 days to be served immediately and 150 days to be held in remission pending a February 2012 hearing), 75 hours of public service, and various fines and fees.

¶ 26 This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28 Defendant asserts Detective Rath violated her fourth amendment rights by searching her purse. She argues the trial court erred in denying her motion to suppress the evidence discovered therein, as well as the evidence obtained in her car and gathered during the ensuing DUI investigation.

¶ 29                                A. Standard of Review

¶ 30 In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542, 857 N.E.2d 187, 195 (2006) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). Under this standard, a trial court's findings of historical fact are reviewed only for clear error, and we give due weight to any inferences drawn from those facts by the fact finder. *Id.* "In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence." *Id.* "This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony." *People v. Pitman*, 211 Ill. 2d 502, 512, 813 N.E.2d 93, 100-01 (2004). We remain free, however, to undertake our own assessment of the facts in relation to the issues and draw our own conclusions when deciding what relief should be granted. *Luedemann*, 222 Ill. 2d at 542, 857 N.E.2d at 195. Accordingly, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Id.*

¶ 31        B. The *Terry* Exception to the Fourth Amendment Warrant Requirement

¶ 32        Both the fourth amendment and the Illinois Constitution of 1970 guarantee the right of individuals to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The search and seizure provisions of the Illinois Constitution are interpreted in limited lockstep with the fourth amendment to the United States Constitution. *People v. Fitzpatrick*, 2013 IL 113449, ¶ 15, 986 N.E.2d 1163. "The 'essential purpose' of the fourth amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." *People v. McDonough*, 239 Ill. 2d 260, 266, 940 N.E.2d 1100, 1106 (2010) (citing *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)). "Reasonableness in this context generally requires a warrant supported by probable cause." *People v. Love*, 199 Ill. 2d 269, 275, 769 N.E.2d 10, 14 (2002) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

¶ 33        In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court provided an exception to the warrant and probable cause requirements. Under *Terry*, if a police officer has "knowledge of sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed, or is about to commit, a crime" (*People v. Smithers*, 83 Ill. 2d 430, 434, 415 N.E.2d 327, 330 (1980)), the officer may briefly stop and detain the person to make reasonable inquiries (*People v. Sorenson*, 196 Ill. 2d 425, 432, 752 N.E.2d 1078, 1084 (2001)). In Illinois, the "*Terry* stop" has been codified under section 107-14 of the Code of Criminal Procedure of 1963 (Code), as follows:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102-15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." 725 ILCS 5/107-14 (West 2010).

¶ 34        Additionally, under *Terry*, "if the officer reasonably believes that the person questioned may be armed and dangerous, the officer may conduct a limited patdown search for weapons, commonly called a frisk." *Love*, 199 Ill. 2d at 275, 769 N.E.2d at 15. The "*Terry* frisk" or "*Terry* search" has also been codified in Illinois under section 108-1.01 of the Code, as follows:

> "When a peace officer has stopped a person for temporary questioning pursuant to Section 107-14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons. If the officer discovers a weapon, he may take it until the completion of the questioning, at which time he shall either return the weapon, if lawfully possessed, or arrest the person so questioned." 725 ILCS 5/108-1.01 (West 2010).

This reasonable suspicion or belief is met if a reasonably prudent person, when faced with the circumstances the police officer confronted, would have believed his safety or the safety

of others was in danger. *Sorenson*, 196 Ill. 2d at 433, 752 N.E.2d at 1084. The reasonableness of the police officer's belief is measured by an objective standard based upon the facts and circumstances known to the officer at the time of the intrusion. *People v. Flowers*, 179 Ill. 2d 257, 264, 688 N.E.2d 626, 630 (1997) (citing *Terry*, 392 U.S. at 21-22). The officer conducting the search "must be able to point to specific, articulable facts which, when taken together with natural inferences, reasonably warrant the intrusion." *Id.*

¶ 35    The *Terry* exception does not permit a general exploratory search. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). Our supreme court has held that once a reasonable belief of danger arises, "the type of search authorized in *Terry* is one confined in scope to an intrusion reasonably designed to discover weapons or objects capable of use as weapons." *People v. Lee*, 48 Ill. 2d 272, 276, 269 N.E.2d 488, 491 (1971) (citing *Terry*, 392 U.S. at 29). "The sole justification for the search allowed by the *Terry* exception is the protection of the police officer and others in the vicinity, not to gather evidence." *Sorenson*, 196 Ill. 2d at 432, 752 N.E.2d at 1084. "If the protective search goes beyond what is necessary to determine if a suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* (citing *Dickerson*, 508 U.S. at 373).


¶ 36                    C. The Search of Defendant's Purse

¶ 37    The trial court concluded, and both parties agree, the encounter in this case was a valid seizure under *Terry* up until the point in time when Detective Rath located cannabis in defendant's purse. After the discovery of cannabis, the nature of the encounter became a custodial arrest. The record supports this finding. Accordingly, we must determine (1) whether Rath's search of defendant's purse was supported by an objectively reasonable belief defendant was armed and dangerous such that Rath's safety or the safety of others was at risk (*Flowers*, 179 Ill. 2d at 264, 688 N.E.2d at 630), and, if so, (2) whether Rath's search was properly limited in scope to an intrusion necessary to find weapons or objects capable of being used as weapons (*Lee*, 48 Ill. 2d at 276, 269 N.E.2d at 491).

¶ 38    Initially, we note neither officer testified he suspected defendant of being armed and dangerous at any point during the encounter. As noted above, at the hearing on the motion to suppress, the following exchange took place between defense counsel and Rath:

"Q. At that time [(when Rath searched defendant's purse)] did you observe anything to indicate that [defendant] would have a weapon?

A. No.

Q. Had you received any information that [defendant] was involved in any type of offense that would involve a weapon?

A. No."

¶ 39    Although Detective Rath confirmed in his testimony he "opened the top of [defendant's] purse to check for the presence of a weapon, or why [defendant] would be making such obvious attempts to get her purse," this does not constitute a specific, articulable fact which would justify Rath in believing defendant was armed and dangerous. In *People v. Galvin*, 127 Ill. 2d 153, 169, 535 N.E.2d 837, 844 (1989), the supreme court addressed a similar issue.

In that case, at the hearing on the defendant's motion to suppress evidence discovered during a *Terry* stop, the State asked the officer, " 'When you stopped that vehicle and made the pat-search on weapons for [the defendant], was that in order to protect your own safety?' " *Id.* at 168. The officer responded, " 'yes.' " *Id.* The supreme court held the officer's answer "[did] not rise to the level of specific and articulable facts necessary to justify a search for weapons." *Id.* at 169. The officer did not articulate reasons that would lead a reasonably prudent person to believe his safety was in danger. In this case, Rath's testimony he was looking for a weapon, among other things, is nothing more than a statement of his apparent thought process *after* he decided to search. If Rath did search defendant's purse to check for the presence of a weapon, the pertinent question would be *why* he believed the search was necessary, not *what* he hoped to determine by conducting the search.

¶ 40      The trial court found (1) Detective Rath observed defendant being "unusually anxious" about the "particular contents" of her purse, (2) the manner in which defendant acted would raise a "significant suspicion" about what was in the purse, and (3) there were repeated actions of grabbing for the purse by defendant. We accept those findings as true. However, in conducting our own assessment of the facts in relation to the issue of whether Rath had reason to believe defendant was armed and dangerous, we disagree with the court's ultimate conclusion. Although the court's findings might very well support a reasonable belief defendant's purse contained something she did not want the officers to find, perhaps even something illegal, that is an entirely different question than whether the facts and circumstances supported a reasonable belief she was armed and dangerous.

¶ 41      In *People v. Davis*, 352 Ill. App. 3d 576, 577, 815 N.E.2d 92, 94 (2004), two Elgin, Illinois, police officers initiated a *Terry* stop of the juvenile defendant because he was riding a bicycle at night without a light (see 625 ILCS 5/11-1507(a) (West 2002)). While the officers were questioning him, "defendant appeared nervous. Specifically, defendant was fidgeting, looking around, and 'frantically' attempting to 'dive' into his right-front pocket." *Id.* at 578, 815 N.E.2d at 95. When the defendant's fingers were inside of his pocket, the officers asked to see his hands. *Id.* The defendant initially complied, but he soon attempted to reach back into his pocket. *Id.* One of the officers frisked the defendant and removed a box cutter from his pocket, at which time a baggie of cocaine was simultaneously discovered. *Id.*

¶ 42      The *Davis* court found the defendant's attempts to put his hands in his pocket insufficient to justify the search. *Id.* at 581, 815 N.E.2d at 97-98. The court noted, although nervousness may be a pertinent factor in determining reasonable suspicion (see *People v. Moore*, 341 Ill. App. 3d 804, 811, 792 N.E.2d 836, 842 (2003)), "nervousness alone does not justify a frisk" and "it is not unusual for people to become nervous when police officers approach them." *Davis*, 352 Ill. App. 3d at 581, 815 N.E.2d at 97. The court concluded the defendant could have been putting his hands in his pockets for many nonthreatening reasons, such as "attempting to keep warm, give the officers his parole officer's phone number, or locate the identification for which the officers asked." *Id.* at 582, 815 N.E.2d at 98. We note, although the appellate court in *Davis* affirmed the trial court's order granting the defendant's motion to suppress, its ruling was based upon a *de novo* application of the law to the undisputed facts, and not upon deference to the trial court's ruling.

¶ 43      The court in *Davis* cited *People v. Dotson*, 37 Ill. App. 3d 176, 177, 345 N.E.2d 721, 722

-11-

(1976), in support of its conclusion. In *Dotson*, a Chicago police officer and his partner stopped defendant for negligent driving. *Id.* While the officer examined the defendant's driver's license, the defendant kept putting his hand in his pocket, took several steps back from the officer, and shifted his weight on his feet. *Id.* The officer then frisked the defendant and found a concealed weapon. *Id.* The trial court granted the defendant's motion to suppress the weapon, and the appellate court affirmed, finding the officer's observations did not amount to a proper basis for the frisk. *Id.* In reaching this conclusion, the appellate court specifically noted the defendant could have put his hand in his pocket for an innocuous reason, such as attempting to keep warm. *Id.*

¶ 44    *Davis* and *Dotson* stand for the proposition that, while the police officer need not rule out every possible innocent explanation for the suspect's actions, the officer must articulate some facts that would tend to raise the possibility that the suspect is armed and dangerous above other reasonable, nonthreatening possibilities. See also *People v. Creagh*, 214 Ill. App. 3d 744, 747-48, 574 N.E.2d 96, 98 (1991) ("looks, gestures, and movements taken alone" were insufficient to justify the *Terry* search because they may be innocent and the officer "did not testify that he was in fear of his safety, and there was absolutely no evidence that [the officer] had reason to believe that the defendant was armed and dangerous"); *People v. Anderson*, 304 Ill. App. 3d 454, 463, 711 N.E.2d 24, 30 (1999) (the mere fact that officers saw defendant put something in his jacket pocket as they walked toward him did not provide adequate basis for officers' alleged fear for their safety because the officers could not see what the defendant put into his pocket, and the defendant's movement had numerous innocuous explanations); *People v. Green*, 358 Ill. App. 3d 456, 461, 832 N.E.2d 465, 470 (2005) (*Terry* search of the defendant's backpack impermissible where "[the officer] testified that he never suspected that defendant had a weapon and that defendant never acted aggressively toward him").

¶ 45    In this case, defendant was nervous, anxious, and pacing around after being told to exit her car and stand with the officers at the rear of the vehicle. After watching Sergeant Rein look through her purse for identification, she decided to withdraw her consent and retake possession of the purse. Once defendant regained control of her purse, Rein took it back and placed it two or three feet away from defendant on the trunk of her car. After Rein instructed defendant not to reach *into* her purse, defendant made subsequent movements the officers described as attempts to "go at," "grab," "grab at," "get at," "get into," "get toward," "get[ ] control," and "gain control of" the purse. However, neither officer testified as to the precise number of "attempts" defendant made or whether she was actually successful at accessing, or even making physical contact with, the purse. Because the movements were made while Detective Rath was busy looking through paperwork, he could not have been responsible for defeating defendant's attempts to get the purse. Rein never testified he physically halted any of defendant's "movements" toward the purse prior to placing her in handcuffs. In the context of a *Terry* search, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Because defendant was standing unsecured only two or three feet away from the purse, we fail to understand how her "repeated actions of grabbing for the purse," as the trial court described it, could be entirely unsuccessful and, at the same time, perceived

-12-

as consistent with the actions of a person trying to obtain a weapon to use against the officers or others.

¶ 46    We know defendant attempted to get to her purse after being told not to, but the record is completely devoid of evidence explaining why those attempts would suggest, of all possibilities, she was trying to obtain a weapon. They certainly did not suggest as much to Detective Rath, who testified he had not observed anything to indicate defendant had a weapon. "Although the officer's subjective belief is not dispositive of the validity of the frisk, it is probative of that determination." *Flowers*, 179 Ill. 2d at 264-65, 688 N.E.2d at 630 (citing *Galvin*, 127 Ill. 2d at 168, 535 N.E.2d at 843). "This is particularly true where, as here, the officer candidly admits that he had no reason to believe that the defendant was armed." *Id.* at 265, 688 N.E.2d at 630. Indeed, neither officer subjectively believed, or could explain why a reasonable person would have believed, that access to a weapon, as opposed to any other nonthreatening motivation, was the reason defendant apparently wanted to gain control of her purse.

¶ 47    *Terry* permits a protective search only when the suspect "is armed and *presently* dangerous." (Emphasis added.) *Terry*, 392 U.S. at 24. Here, the officers had no reason to believe defendant was armed or presently dangerous at the time of the search. This stop was made in midday on a street with busy traffic. Defendant, a 90-pound woman, was in handcuffs and seated on the bumper of her car, and three police officers were on the scene. The purse was behind her on the trunk. According to Sergeant Rein's uncontroverted testimony, defendant was unable to reach the purse at that time and she made no attempts to do so. In the context of this *Terry* stop, the officers were entitled to ensure their own safety, even in the absence of reason to believe defendant was armed and dangerous, by preventing defendant from accessing her purse during the encounter. They properly took that precaution. Thereafter, the interest of officer safety had been satisfied and Rath's search of the purse, which consisted of opening the purse and inspecting its contents, could have done nothing to further it. See *People v. Brown*, 2013 IL App (1st) 083158, ¶¶ 18, 27 ("Once defendant had been handcuffed, he could not reach the items in his jacket pocket." This fact "eliminated the need to frisk him for officer safety."). While the *Terry* stop was constitutionally authorized, the *Terry* search was not, because it was objectively unreasonable for the officers to believe they were in danger or defendant was armed with a weapon.

¶ 48    The State contends the search of defendant's purse was reasonable because "defendant needed to produce identification, which she said was in the purse. *** Given the apparent threat to safety, police properly ruled out the presence of weapons in the purse in order to manage the hazards of removing defendant's handcuffs, returning her purse, and permitting her to retrieve her identification." We reject this argument for three reasons.

¶ 49    First, as we have already explained, neither officer had reason to believe defendant was armed or dangerous. Therefore, if the officers needed defendant to produce identification, they had no reason to prohibit her from producing it herself.

¶ 50    Second, although section 107-14 of the Code (725 ILCS 5/107-14 (West 2010)) provides an officer "may demand the name and address of the person" during a lawful *Terry* stop, this provision cannot be interpreted to allow police to search through a suspect's belongings in

search of his or her physical identification card. Such an interpretation would allow section 107-14 to override the constitutional restrictions of *Terry*, which permit officers to conduct a limited search only for the purpose of discovering weapons or objects capable of being used as weapons–not to locate a suspect's identification card. Further, although section 6-112 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/6-112 (West 2010)) requires a driver to produce his or her driver's license upon demand by a police officer, defendant never refused to produce her driver's license and neither officer gave her a chance to produce it herself. Under the State's theory, an officer could use this statutory authority to demand identification as a basis for conducting a protective search through whatever pocket or container the suspect will need to reach into to comply with the demand.

¶ 51    Finally, the State imputes a reasoning behind Detective Rath's decision to search that is completely unsupported by the record. Neither Rath nor Sergeant Rein testified they planned on returning defendant's purse to her so she could retrieve her identification. On the contrary, Rath testified his purpose for searching the purse was "to view the contents of it, to see what is it that she's trying to–why is she trying to gain control of this purse so bad?" He never testified he searched the purse as a protective measure before allowing defendant to retrieve her identification. Rather, his curiosity was piqued about what was in the purse, but his curiosity does not justify a *Terry* search.

¶ 52    Absent a reasonable belief defendant was armed and dangerous, Detective Rath's search of defendant's purse was not justified by the *Terry* exception to the warrant requirement. Because we find the search was not justified, we need not address defendant's remaining arguments regarding the validity of the search.

¶ 53    Defendant argues if the search was invalid, the other evidence must be suppressed as fruit of the poisonous tree and consequently defendant's conviction should be vacated. Because the trial court found the search valid and thus did not have the opportunity to consider the ramifications of the invalid search, we remand this case for further proceedings. We express no opinion regarding the impact of the unlawful search on the admissibility of the other evidence.

¶ 54                              III. CONCLUSION
¶ 55    For the foregoing reasons, we reverse the trial court's denial of the motion to suppress and find the search of defendant's purse was not justified. We remand this case for further proceedings consistent with this opinion.

¶ 56    Reversed and remanded.