2023 IL App (1st) 221597-U

FIRST DIVISION
October 10, 2023

No. 1-22-1597

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 21 CR 13176 |
| PERCY LOVE, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Vincent Gaughan, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Coghlan concurred with the judgment.

**O R D E R**

¶ 1  *Held*:  The circuit court erred in denying the defendant's motion to quash arrest and suppress evidence, where the police lacked probable cause to arrest the defendant and the State concedes that the investigatory stop exceeded the frisk permissible under *Terry v. Ohio*, 392 U. S. 1 (1968).

¶ 2  After a jury trial in the circuit court of Cook County, the defendant, Percy Love, was found guilty of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1 (West 2018))

and sentenced to four years in prison. On appeal, the defendant contends that the circuit court erred in denying his motion to suppress the handgun that was recovered from his backpack and the subsequent incriminating statements he made to police because the search of his backpack went beyond the frisk permitted under *Terry v. Ohio*, 392 U. S. 1 (1968). In addition, the defendant argues, for the first time on appeal, that the UPWF statute (720 ILCS 5/24-1.1 (West 2018)) under which he was convicted is unconstitutional, as applied to him, as it violates the second amendment of the United States Constitution (U.S. Const., amend II). Specifically, the defendant contends that under the new test for evaluating gun laws established by the recent decision of the United States Supreme Court in *New York State Rifle & Pistol Ass'n, v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111 (2022), there is no historical tradition of imposing lifetime bans on firearm possession by non-dangerous persons, such as himself. Accordingly, the defendant asserts that because his UPWF conviction was entirely premised upon his single prior 13-year-old residential burglary conviction, which he committed when he was only 19 years old, the statute is unconstitutional as applied to him. For the following reasons, we reverse the circuit court's denial of the defendant's motion to quash arrest and suppress evidence, and vacate the defendant's conviction and sentence.

¶ 3                                  I. BACKGROUND

¶ 4      The record below reveals the following relevant facts and procedural history. In October 2021, the defendant was charged with, *inter alia*, UPWF (720 ILCS 5/24-1.1 (West 2018)) for knowingly possessing a handgun after having previously been convicted of a felony offense, namely, residential burglary.[1] The defendant was also charged with: (1) possession of more than 30 but less than 500 grams of cannabis with intent to deliver (720 ILCS 550/5(d) (West 2018));

---

[1] The defendant was also charged with two counts of aggravated unlawful use of a weapon (AUUW) for having possessed the handgun without a valid Firearm Owners Identification card (FOID) card and/or a concealed carry license (720 ILCS 5/24-1.6(a) (West 2018)), but the State *nolle prossed* both counts prior to trial.

and (2) armed violence premised on carrying a firearm while committing this narcotics offense (720 ILCS 5/33A-2 (West 2018)).

¶ 5    Prior to trial, the defendant filed a motion to quash arrest and suppress evidence, arguing that he was unlawfully seized and searched because the police officers had no reasonable suspicion or probable cause to believe that he had or was about to commit a crime. The defendant therefore sought the suppression of the handgun recovered from his backpack and the incriminating statements he subsequently made to the police.

¶ 6    At the March 8, 2022, suppression hearing, the defendant elicited testimony from two Chicago police officers, Kinney and Adams.

¶ 7    Officer Kinney first testified that at about 5:20 p.m. on September 29, 2021, he was in uniform inside an unmarked squad car with three partners, Officers Fransin, Garrett and Guerra. Officer Kinney was driving, while Officer Fransin sat in the front passenger seat and Officer Guerra remained in the back. While routinely patrolling the area near 7911 South Cottage Grove Avenue, Officer Kinney observed the defendant standing on the sidewalk about 20 feet away from the passenger side of the police squad car, holding a clear five-by-five-inch plastic Ziploc bag and using his fingers to sprinkle "a green leafy substance, suspect cannabis" onto a brown rolling (cigarette) paper held by an unknown man. Officer Kinney admitted that he did not see either the defendant or the other man holding or exchanging any money. In addition, he did not see what the other man did with the suspect cannabis after it was sprinkled onto his rolling paper. Based solely on this observation, Officer Kinney stopped his vehicle and approached the defendant.

¶ 8    As he approached the defendant, Officer Kinney did not see the plastic Ziploc bag in the defendant's hands but noticed that the backpack he was carrying on his chest was open. He could not see inside the backpack. Officer Kinney testified that for his own safety, he immediately

performed a pat down search, feeling the outside of the backpack. During that search, he felt a hard object, which he could not identify. Officer Kinney acknowledged, however, that his police report does not contain any reference to him feeling a hard object inside the backpack.

¶ 9    After feeling the backpack, Officer Kinney handcuffed and detained the defendant because he was "reaching, trying to make several attempts to reach inside." His partner, Officer Guerra, then searched the defendant's backpack because the defendant placed the "unsealed" plastic bag containing the "green, leafy substance, suspect cannabis in the bag." Officer Kinney further testified that he believed that there was a handgun in the defendant's backpack because from his "training and experience" he knew that "when there is cannabis or narcotics involved, there's usually sometimes a weapon." He admitted, however, that during their encounter, the defendant never threatened him or any of the other police officers on the scene.

¶ 10    Officer Kinney next testified that during the search of the defendant's backpack, his partner recovered cannabis and a black 9 mm handgun. The defendant was subsequently arrested and taken to a police station where he waived his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)), and agreed to speak with Officers Kinney and Adams. According to Officer Kinney, during that conversation, the defendant told them that he just given "some weed" to another person and that he only had the gun in his backpack for protection.

¶ 11    During the suppression hearing, the defense offered into evidence footage from Officer Kinney's body-worn camera. That footage initially shows Officer Kinney getting out of the driver's seat of an unmarked squad car and walking towards the defendant, who is standing on the sidewalk on the passenger side of the vehicle chatting to another police officer and a civilian in a red T-shirt. The camera footage reveals the defendant wearing a thick fabric, multi-colored backpack that extends from his chest down to the top of his stomach. As Officer Kinney

approaches, the defendant appears cooperative and is responding to Officer Kinney's commands. He is neither holding a plastic Ziploc bag nor placing it inside his backpack. In addition, he does not appear to be threatening in any way. In fact, it appears that the officers are familiar with the defendant as they address him by his first name.

¶ 12 The camera footage next shows Officer Kinney approaching the defendant and immediately beginning a pat down search of the defendant's backpack, at which point the defendant reflexively moves his hands up toward the bag. At that point, Officer Kinney and his partners immediately handcuff the defendant and search his backpack.

¶ 13 At the motion to suppress hearing, Officer Adams next testified that he interviewed the defendant at the police station with Officer Kinney. Officer Adams acknowledged that body-worn camera footage of that interview reveals him telling the defendant that that the reason the police stopped him was that there were a number of shootings on Cottage Grove Avenue and that they needed to "identify everybody standing on that corner." He also acknowledged that he then told the defendant, "Today was your turn."

¶ 14 When asked to clarify what he meant by these comments, Officer Adams claimed that the police stopped the defendant because he had cannabis in his bag but that they were in the area because of the shootings on Cottage Grove Avenue. The officer further averred that his statement that "today was [the defendant's] turn" was in reference to the defendant being stopped because of the cannabis in his bag.

¶ 15 After hearing the evidence, the circuit court denied the defendant's motion to quash arrest and suppress evidence. The court found that the stop at issue "was not a *Terry* stop" and that instead the officers had probable cause to arrest the defendant based of their observation of the hand-to-hand transaction (*i.e.*, the delivery) of the suspect cannabis, and the cannabis being in a

clear bag and not packaged for "transportation" and therefore not in compliance with "the laws of Illinois about how it could be carried or transported." The court further noted that Officer Adams' remarks provided an ancillary explanation for the stop.

¶ 16     On July 19, 2022, the defendant proceeded with a jury trial, at which the State presented the testimony of two witnesses, Chicago Police Officer Guerra and Illinois State Police forensic scientist Cheryl Mytys Burger.

¶ 17     Officer Guerra first testified that at about 5:20 p.m. on September 29, 2021, together with his partners Officers Kinney and Fransin, he was on routine patrol of a "hot spot" near East 79th Street and South Cottage Grove Avenue. He described a "hot spot" as a heavily populated area with a lot of narcotics-related incidents and high conflict gang violence. Officer Guerra was riding in the rear passenger seat of an unmarked squad car when he observed the defendant, who had a black multi-colored backpack around the front of his body, standing about 15 to 25 feet away on the sidewalk. Officer Guerra saw the defendant remove a clear sandwich bag with a green leafy substance, which he suspected was cannabis, from his backpack and then give some of that substance to an individual who was holding a "brown rolled paper," or "brown cigar wrapping." Officer Guerra averred that he recognized the substance as suspect cannabis because it was easily visible in the clear plastic bag and because of his training and experience. Officer Guerra acknowledged that he did not see the other individual give any money to the defendant.

¶ 18     According to Officer Guerra, after making these observations, his partners stopped the vehicle and all three of them exited and approached the defendant. There were about four or five people nearby, so the officers asked the defendant to step over to their vehicle and he complied. Officer Guerra averred that because the defendant's backpack was open, they asked him if he had any weapons. In response, the defendant became "a little agitated" and held his hands before

the opening of the backpack. Officer Guerra instructed the defendant to keep his hands out of his backpack for officer safety and then did a quick frisk of the backpack. The officer felt a hard object near the center of the backpack and informed his partners. He then asked for the defendant to be handcuffed, while he searched the backpack. Inside one of the pockets of the backpack, he found a loaded black 9 mm handgun. Officer Guerra testified that the handgun had been easily accessible to the defendant because the backpack was open.

¶ 19    Officer Guerra further averred that once at the police station he recovered additional items from the defendant's backpack, namely: 3 clear plastic bags and 13 smaller clear plastic baggies containing suspect cannabis; a digital scale; and two packages of empty Ziploc bags. Based on his knowledge and training, Officer Guerra testified that the Ziploc bags and the clear knotted baggies were commonly used to package cannabis because it made it easier to move or deliver. Based on the quantity and packaging of the suspect cannabis, Officer Guerra believed that there was "more than what was used for personal use."

¶ 20    Officer Guerra next testified that after the defendant was *Mirandized*, he spoke to the defendant together with Officers Kinney and Adams. During that conversation, the defendant stated that he had just given the other individual "some weed" to smoke and that he only carried the gun for protection.

¶ 21    At trial, the State next presented Officer Guerra's body-worn camera footage. Some parts of that footage contain audio, while others do not.

¶ 22    The first portion of the footage showing the police's initial encounter with the defendant is without audio. It reveals the defendant carrying a colorful backpack on his chest and standing on the sidewalk next to an individual in a red T-shirt. After he is motioned over, the defendant complies and approaches several police officers standing on the street. The officers immediately

7

begin patting down the defendant's backpack. The defendant appears nervous and reflexively moves his arms towards the sides of the backpack. The officers then hold the defendant's hands behind his back and handcuff him, while Officer Guerra looks inside. He puts on a glove, unzips the backpack completely, reaches deep into the interior back pocket, and retrieves a black handgun.

¶ 23    The remainder of Officer Guerra's body-worn camera footage shows the defendant's interview at the police station. This footage contains audio and reveals the following conversation between the defendant and the four police officers present in the room. After the defendant is *Mirandized* and agrees to speak to the police, he asks why he was stopped, to which one officer replies, "when we saw you, it looked like you were engaged in a hand-to-hand transaction with the guy in the red shirt there." The defendant responds that he was not even passing the other guy a "blunt" but was only adding some "weed" to it. As he says this, the defendant is making a sprinkling gesture with his fingers. The officer nods and asks him, "Was that legal?," to which the defendant replies, "Bro, come on bro."

¶ 24    The defendant then asks, "basically you hopped out on me for rolling a blunt, that was y'all probable cause," to which an officer replies, "you had weed; you have cannabis (garbled)." The defendant then turns to the remaining officers and says, "I know I got weed, y'all see me smoke weed every day, y'all know me, y'all see me smoking weed everyday bro. You don't mess with me. That's why I didn't move. I was just holding my weed in my hand." The officer nods again and says, "we were gonna come out and just disperse you, because that's what we do, but then you started tweaking out so that raised our suspicion." The defendant responds, "I was cool," and "I ain't tweaking nothing out." He explains that the officers told everyone standing on the sidewalk "to come over here" because "we just want to run you all real quick" and that he

obliged. The officer who *Mirandized* the defendant nods to this assessment, stating, "Right." A second officer then jumps in, "But, you would not keep your hands out of your book bag, and then you go like, oh you guys can't search me." The defendant replies, "I was about to grab the weed out and give y'all the weed."

¶ 25　The camera footage further reveals another portion of the police interview during which the defendant is seen and heard explaining that his backpack was open on his chest because he had his cell phone out on it and was using Facetime "to talk to his girl," while his friend kept pestering him and "saying, come on, let's roll up." The defendant says, "I was getting the weed and was still about to get back on *** Facetime when you all came out." The defendant further tells the officers that they never had a problem with him before because he "doesn't mess with anybody." In addition, he adds, "y'all caught me with the gun, bro, that was for protection, I don't shoot at anybody. I don't do sh**."

¶ 26　After the video footage was entered into evidence, the State called Illinois State Police forensic scientist Burger, who testified that she analyzed the baggies recovered from the defendant's backpack and determined that they "contained Delta 9 THC or cannabis." Burger further testified that the total weight of the cannabis was "over the 30 grams weight class."

¶ 27　The parties then stipulated that the defendant had "a prior qualifying felony offense." The jury, however, was not informed of the nature of that prior felony conviction.

¶ 28　After the State rested, the defendant offered no evidence in his case-in-chief.

¶ 29　The jury subsequently found the defendant *not* guilty of armed violence and possession of cannabis with intent to deliver, but guilty of UPWF.

¶ 30　At the sentencing hearing, in mitigation, defense counsel argued that aside from the predicate residential burglary conviction, which he committed when he was only 19 years old,

for the next 13 years, the defendant committed no other felonies. Defense counsel also pointed out that the defendant had four children, and offered the testimony of his fiancée, who testified that he was a "loving father" and "a family man." The defense also offered four separate letters from the defendant's former employer and four different family members attesting to his good character. The circuit court ultimately sentenced the defendant to four years imprisonment, two years above the sentencing minimum.[2] The defendant now appeals.

¶ 31                                II. ANALYSIS

¶ 32     On appeal, the defendant makes two contentions. First, he asserts that the circuit court erred in denying his motion to quash arrest and suppress evidence, namely, the handgun retrieved from his backpack and the subsequent statements he made to the police. In addition, the defendant challenges the constitutionality of the UPWF statute as applied to him, contending that pursuant to the recent decision of the United States Supreme Court in *Bruen*, it violates his second amendment right to keep and bear arms (U.S. Const., amend II) because it criminalizes his mere possession of a weapon even though for the past 13 years he has been a nonviolent and non-dangerous person. Because we find the suppression issue to be dispositive, we address it first.

¶ 33     It is axiomatic that whenever a defendant moves to suppress evidence on the basis of an illegal search, the defendant bears the initial burden of presenting a *prima facie* showing that the evidence was illegally obtained. *People v. Brooks*, 2017 IL 121413, ¶ 22; *People v. Cregan*, 2014 IL 11360, ¶ 23. Once the defendant makes a *prima facie* showing that the evidence was illegally obtained, the burden shifts to the State to introduce evidence to counter the defendant's *prima facie* case. *Id*.

---

[2] The Class 3 UPWF conviction carried a sentencing range between two- and ten-years' imprisonment. 720 ILCS 5/24-1.1 (West 2018).

¶ 34　In reviewing the circuit court's ruling on a motion to quash arrest and suppress evidence, we apply a two-part standard of review. See *People v. Gaytan*, 2015 IL 16223, ¶ 18; *People v. Grant*, 2013 IL 112734, ¶ 12. Under this standard, we accord great deference to the circuit court's factual findings and will reverse those findings only if they are against the manifest weight of the evidence. *People v. Hackett*, 2012 IL 111781, ¶ 18. However, we give less deference to factual findings based on video evidence because, unlike witness testimony, a trial court does not occupy a position superior to the appellate court in evaluating video evidence. *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29. We review *de novo* the circuit court's ultimate legal ruling as to whether the police officer's conduct was legally justified. *Id.* In doing so, we are free to make our own assessments of the legal issues, based upon the findings of fact, and to draw our own conclusions. *Id.*

¶ 35　In the present case, the parties dispute the nature of the defendant's encounter with the police. The defendant argues that while the police performed a legal *Terry* stop, they did not have a lawful basis for frisking his backpack, while the State maintains that a probable cause analysis applies.

¶ 36　The fourth amendment to the United States Constitution protects the "right of the people to be secure * * * against unreasonable searches and seizures." U.S. Const., amend IV. A search conducted without a warrant is "considered *per se* unreasonable * * * unless it falls within one of the limited number of exceptions to the warrant requirement." *Brooks*, 2017 IL 121413, ¶ 27. Relevant to this appeal, two such exceptions to the warrant requirement include: (1) searches incident to lawful *Terry* stops (*Terry*, 392 U.S. at 24)); and (2) searches incident to an arrest supported by probable cause (*Arizona v. Gant*, 556 U.S. 332, 338 (2009)).

¶ 37　Under *Terry*, a police officer may detain a citizen without an arrest warrant where the

officer's observations create a reasonable articulable suspicion that a crime has been or is about

to be committed. *Terry*, 392 U.S. at 22 (codified in the Illinois Code of Criminal Procedure of

1963 as 725 ILCS 5/107-104 (West 2008)). The fact that an officer has reason to stop a person,

however, does not automatically justify the further intrusion of a search for weapons. *People v.*

*Flowers*, 179 Ill. 2d 257, 263-64 (1997) (citing *Terry*, 392 U.S. at); see also *Lockett*, 2022 IL

App (1st) 190716, ¶ 21; *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001); *People v. Galvin*, 127

Ill. 2d 153, 156 (1989). Rather, in order to validly conduct a weapons frisk under *Terry*, the

police officer must have reason to believe that "the individual whose suspicious behavior he is

investigating at close range is armed and presently dangerous to the officers or to others." *Terry*,

392 U.S. at 24; see also *People v. Flunder*, 2019 IL App (1st) 171635, ¶ 27; *Flowers,* 179 Ill. 2d

at 263-64; *Galvin*, 127 Ill. 2d at 156. The "sole justification" for the search allowed by the *Terry*

warrant exception is "the protection of the police officer and others in the vicinity, not to gather

evidence." *Flowers*, 179 Ill. 2d at 263-64 (citing *Minnesota v. Dickerson*, 508 U.S. 366, 373

(1993)). The scope of a *Terry* search is therefore strictly limited to a search for weapons. *Id*.

¶ 38    The validity of a frisk conducted during a valid investigatory stop is assessed by an

objective standard. *Terry*, 392 U.S. at 21-22. The question is whether a reasonably prudent

person in the circumstances would be warranted in the belief that his safety or that of others was

in danger. *Id*. at 27. The officer conducting the frisk must be able to point to specific, articulable

facts which, when taken together with natural inferences, reasonably warrant the intrusion. *Id*. at

21. These facts need not rise to the level of probable cause but must constitute more than a mere

hunch. *Flowers*, 179 Ill. 2d at 64 (citing *People v. Scott*, 148 Ill. 2d 479, 503 (1992)).

¶ 39    In contrast, a police officer has probable cause to arrest where the totality of the

circumstances would lead a reasonable person to believe that an individual has committed a

crime. *People v. Grant*, 2013 IL 112734, ¶ 11 (citing *People v. Wear*, 229 Ill. 2d 545, 563 (2008)); see also *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 110. Where probable cause exists, the officer may perform a warrantless search of the individual incident to that arrest. *Gant*, 556 U.S. at 338. This search includes items immediately associated with the individual because they are in his physical possession. *People v. Cregan*, 2014 IL 113600, ¶ 50. The search may occur before the officer actually arrests the individual but must be supported by probable cause independent of any contraband found as a result of the search. *People v. Little*, 322 Ill. App. 3d 607, 612 (2001). Whether an officer has probable cause to arrest is an objective consideration, and the subjective intent of the officer in initiating the encounter, including whether the officer planned to arrest the individual, is irrelevant. *Whren v. United States*, 517 U.S. 806, 813-15 (1996); see also *People v. Kolichman*, 218 Ill. App. 3d 132, 139 (1991).

¶ 40    As noted above, on appeal, the defendant concedes that pursuant to *Terry*, the police had a reasonable basis for conducting an investigatory stop but argues that the subsequent frisk of his backpack was illegal because there was no reason whatsoever for the officers to suspect that he was armed or presently dangerous. The State, in turn, apparently agrees that when considered under *Terry*, the police search of the backpack went beyond what is a permissible as a "frisk." The State nonetheless asserts that the search was proper because it was made incident to an arrest and the police had probable cause to arrest the defendant when they observed him sprinkling suspect cannabis onto the rolling paper of another individual. For the following reasons, we disagree with the State.

¶ 41    Four years ago, Illinois became the eleventh state to legalize marijuana for adult recreational use. Since January 1, 2020, over a year before the defendant's encounter with the police, under the Cannabis Regulation and Tax Act (410 ILCS 705/1-1 *et seq.* West 2020)),

Illinois residents 21 years of age or older have been permitted to possess up to and including 30 grams of cannabis, up to 500 milligrams of tetrahydrocannabinol (THC) in a cannabis-infused product, and 5 grams of cannabis concentrate. *Id*. at 10-10. While possession of more than these quantities and delivery of any amount remains illegal and subject to the penalties previously set under the Illinois Cannabis Control Act (720 ILCS 550/4 (a), (b) (West 2020)) (see *People v. Stribling*, 2022 IL App (3d) 210098, ¶ 23), the statute clearly states that a "casual delivery," or a delivery of less than 10 grams of cannabis made "without consideration," is to be "treated in all respects" as mere "possession." (*id*. 550/3(b), 550/6). Possession of any amount less than 10 grams, if achieved in contravention of the Cannabis Regulation and Tax Act, is not a crime, but constitutes a civil law violation, punishable only by a fine. *Id.* at 550/6.

¶ 42    One of the purposes of this sweeping legislation decriminalizing the possession of small amounts of cannabis has been to address the previous disparities in the number of arrests and prosecutions of cannabis related crimes focusing primarily and "disproportionately" on "people of color" and of "low income." See Ahern, Colleen, "Legalization of Marijuana in Illinois: The Broader Implications on Social Justice," 25 Pub. Int. L. Rep. 1 (2019) (noting that "despite constituting 36% of the population in Chicago, in 2016 [prior to the passage of the Cannabis Regulation and Tax Act ] 78% of all marijuana arrets were of black people, and less than 5% were of white people").

¶ 43    Accordingly, applying the new legislation to the totality of the circumstances in the present case, we are compelled to conclude that the police officers lacked probable cause to arrest the defendant. The record reveals that the police officers stopped the defendant solely because they observed him "sprinkling" a green leafy substance, suspect cannabis, onto a rolling (cigarette) paper held by another individual. The officers did not see an exchange of money and

they did not recover any money from either the defendant or the unknown man. The officers also did not see what the unknown man did with the suspect cannabis or rolling paper. No one testified that they were "using" or smoking the cannabis on the street. The record is further devoid of any evidence that the officers witnessed the defendant making prior cannabis transactions or that they investigated the unknown recipient. Accordingly, nothing in the officers' testimony establishes that a reasonably cautious person in the officers' position would have believed that the defendant's sprinkling of suspect cannabis was anything more than a "casual delivery," which is to be treated as mere "possession," or that the defendant possessed more than the permitted amount of 30 grams of cannabis at the time of the police stop. Notably, the jury itself found the State failed to prove beyond a reasonable doubt that the defendant was guilty of possession with intent to deliver of more than 30 grams of cannabis. We therefore conclude that, while the totality of the circumstances could have aroused a reasonable suspicion that the defendant was engaging in suspect conduct, it would not have led a reasonable person to believe that he had actually committed a crime.

¶ 44     In arguing to the contrary, the State presumes that at the time of their arrest, the police officers possessed information that they did not obtain until after the defendant was in police custody at the police station. In this respect, the State argues that the officers had probable cause to believe that the defendant had committed a crime because he admitted to them that he gave another person "some weed" and because they subsequently discovered over 30 grams of cannabis, a scale, and numerous Ziploc baggies in his backpack. The State, however, forgets that a search incident to arrest must be supported by probable cause independent of any contraband found, or subsequent admissions made, as a result of that search. See *Little*, 322 Ill. App. 3d at 612.

¶ 45     The State next argues that the officers had probable cause to arrest the defendant because

when they observed him "sprinkling" the suspect cannabis, he was standing on a public sidewalk and taking the cannabis out from an open plastic bag, which the circuit court found was "not one that was described for transportation" as required under Illinois law. This argument, however, misapprehends the new statute. The packaging requirement of the Cannabis Regulation and Tax Act applies only to the transportation of cannabis in a vehicle, and not on one's person or in one's backpack. The Act mandates that cannabis may not be possessed in a vehicle unless it is in a "reasonably secured, sealed container and reasonably inaccessible while the vehicle is moving." 410 ILCS 705/10-35(a)(2)(D) (West 2020). The Act does not mention, and the State fails to cite to, any packaging requirements for carrying marijuana on one's person or backpack in public. *Id.* Accordingly, whether the plastic bag containing the suspect cannabis was unsecured and unsealed has no bearing whatsoever on the question of whether the police officers had probable cause to believe that the defendant had unlawfully delivered cannabis to another person.

¶ 46    We similarly reject the State's assertion that the defendant's "furtive" movements at the time of the police encounter gave rise to probable cause to arrest him for the unlawful delivery of cannabis. At the outset we note that our courts have repeatedly held that "furtive" movements alone "are insufficient to constitute probable cause" for a warrantless search "since they may be innocent." *People v. Creagh*, 214 Ill. App. 3d 744, 747-48 (1991) ("looks, gestures, and movements," alone are insufficient to establish probable cause as they may be innocuous); see also *In re Jarrell, C*., 2017 IL App (1st) 170932, ¶ 22 (holding that an individual moving his hands towards his crotch and grabbing his waistband in a high crime area alone was insufficient to justify a reasonable suspicions, let alone probable cause, to search incident to an arrest, because such actions are indistinct from innocent behavior); *People v. Slaymaker*, 2015 IL App

(2d) 130528, ¶ 19 (holding that a person putting his hands in his pocket is an "innocuous act," which does not rise to the level of reasonable suspicion of criminal activity or the presence of a weapon, let alone probable cause to arrest); *In re Rafael E.*, 2014 IL App (1st) 133027, ¶ 31 (holding that furtive gestures or movements, such as, "putting something in one's pockets" is "not a hallmark of criminal activity"). Moreover, in the present case, body-worn camera footage from the defendant's encounter with the police reveals that the defendant made no furtive movements whatsoever until he was surrounded by four officers, who immediately began patting down his backpack. Any reflexive movements or minimal agitation that occurred afterwards is clearly attributable to the defendant's nervousness at being surrounded by so many officers.

¶ 47   Accordingly, under this record, we find that the police lacked probable cause to arrest the defendant and that the search of his backpack cannot be justified as a search incident to arrest. See *e.g.*, *People v. Trisby*, 2013 IL App (1st) 112552, ¶ 13 (holding that the police lacked probable cause to conduct a search incident to arrest after witnessing a single transaction in which the defendant took money from a woman and then gave her a small, unidentified object in a high narcotics area, and following a traffic stop, witnessing the defendant move his hand toward his pants pocket a few times).

¶ 48   In coming to this conclusion, we have considered the decision in *People v. White*, 2021 IL App (1st) 191095, cited by the State and find it inapposite. In that case, on appeal, the defendant argued that the court should apply *Terry* to his encounter with the police and find that the officer lacked reasonable suspicion to conduct a *Terry* stop. *Id.*, ¶¶ 18, 20. We rejected the defendant's argument, and instead held that the officer had probable cause to arrest him and search both his person and his backpack based on the totality of circumstances. *Id*. These included the officer observing the defendant gambling on the sidewalk, which is illegal under section 28-1 of the Criminal Code of 2012 (720 ILCS 5/28-1 (West 2018)), and upon noticing

17

the police, first shifting his bag to one side to shield it from officer view, and then walking away. *Id.*, ¶¶ 24-25. In addition, after the officer announced his presence, the defendant ignored the officer's request to stop and attempted to flee up a staircase. *Id.*

¶ 49 The present case is clearly distinguishable from *White*. Unlike the defendant in *White*, here, the defendant neither tried to shift his backpack to hide it from the police nor walked away from the officers when they approached him. Nor did the defendant attempt to flee from the police. Instead, he was responsive and cooperated with their requests to approach and speak with them. What is more, in *White*, there was no dispute that the gambling observed by the officers was a crime under the Criminal Code, punishable as a Class A misdemeanor. See 720 ILCS 5/28-1 (West 2018). In contrast, here, pursuant to the recent changes in law under the Cannabis Regulation and Tax Act, the officers' observation of the defendant "sprinkling" suspect cannabis onto another person's cigarette paper, at best, constituted a "casual delivery," and therefore amounted to mere "possession" of cannabis, which is no longer *per se* a crime.

¶ 50 Because we find that the search of the defendant's backpack was not a valid search incident to arrest, we next consider whether the search was appropriate under *Terry*. In this respect, the record reveals, and State concedes, as it must, that the frisk of the backpack exceeded the scope of *Terry*, because nothing in the defendant's demeanor or behavior at the time of the investigatory stop would have led a reasonable person to believe that he was "armed and presently dangerous to the officers" or to anyone else. See *Terry*, 392 U.S. at 24; see also *People v. Flunder*, 2019 IL App (1st) 171635, ¶ 27; *Flowers,* 179 Ill. 2d at 263-64; *Galvin*, 127 Ill. 2d at 156. The body worn camera footage indisputably shows the defendant standing on the sidewalk and then cooperating and calmly approaching the police at their request. He appears neither threatening nor dangerous. In fact, from the footage it appears that the officers are familiar and friendly with the defendant as they address him by his first name. While it bears noting that, at the suppression hearing, Officer Kinney testified that he

18

performed the frisk of the backpack for his own safety, such generalized and subjective proclamations, without more, are insufficient to articulate a reasonable belief that the defendant was armed and dangerous, so as to justify the intrusion of a search. Our courts have repeatedly held that while an officer's subjective belief regarding the safety of the situation may be considered in determining whether a weapons frisk exceeded the scope of *Terry*, such "subjective belief" must have an evidentiary basis in the record to allow it to be " 'measured against any standard of objective reasonableness.' " *In re Mario T*., 376 Ill. App. 3d 468, 479-80 (quoting *Galvin*, 127 Ill. 2d at 167). Were it not so, " 'an officer would effectively be able to insulate his or her actions from the constitutional safeguards guaranteed to individuals under the fourth and fourteenth amendments,' " simply by invoking "a subjective fear" every time he or she searched a suspect after a valid *Terry* stop. *Id.*

¶ 51    Accordingly, while the officers here had a reasonable basis for conducting their investigatory stop, their subsequent frisk of the defendant's backpack was illegal because there was no reason whatsoever for them to suspect that the defendant was armed or presently dangerous. We therefore conclude that the search of the defendant's backpack was invalid under *Terry*. See *Lockett*, 2022 IL App (1st) 190716, ¶¶ 21-23 (holding that the police were not justified in believing that the defendant was armed and dangerous, so as to justify a *Terry* pat-down, where the defendant looked in the direction of their unmarked car and adjusted his waistband, and when the officers stopped him, adjusted his waistband again and stated that he dropped a "bag of weed").

¶ 52    Lastly, we reject the State's argument that regardless of the legality of the search, the evidence was properly admitted at trial because the police would have eventually discovered the firearm in the defendant's backpack during a routine inventory search. The State ignores the fact that the doctrine of inevitable discovery requires it to establish by a preponderance of the evidence that the contraband would have been discovered through lawful means. See

*People v. Davis*, 398 Ill. App. 3d 940, 959 (2020). Because, here, we have already found that the *Terry* frisk was invalid, and that the officers had no probable cause to arrest the defendant, contrary to the State's position, no inventory search would have ever occurred. Accordingly, the inevitable discovery doctrine does not apply.

¶ 53    For all of the aforementioned reasons, we find that both the handgun recovered from the defendant's backpack and the inculpatory statements he subsequently gave to the police were obtained as a result of an illegal search and should have been suppressed under the "fruit of the poisonous tree" doctrine. See *People v. Henderson*, 2013 IL 114040, ¶ 33 (explaining that under the "fruit of the poisonous tree" doctrine any evidence obtained by an illegal search "is subject to suppression as the 'fruit' of that poisonous tree"); see also *People v. Lockett*, 2022 IL App (1st) 190716, ¶ 19. It goes without saying that without this illegally obtained evidence, the State would have had no case whatsoever against the defendant. Accordingly, instead of remanding the case for a new trial, we vacate the defendant's conviction and sentence. See *Trisby*, 2013 IL App (1st) 112552, ¶ 9; *Lockett*, 2022 IL App (1st) 190716, ¶ 36.

¶ 54    Furthermore, because we vacate the defendant's conviction, we need not address his second amendment challenge to the UPWF statute, contesting that conviction on constitutional grounds.

¶ 55                                    III. CONCLUSION

¶ 56    For the aforementioned reasons, we reverse the circuit court's denial of the defendant's motion to quash arrest and suppress evidence. We further vacate the defendant's conviction and sentence.

¶ 57     Reversed; Conviction and sentence vacated.